The ASSOCIATED GENERAL
CONTRACTORS OF OHIO,
INC., et al., Plaintiffs,

v.

Sandra DRABIK, et al., Defendants.

No. C2–98–943.

United States District Court,
S.D. Ohio,
Eastern Division.

May 20, 1999.

See also 707 N.E.2d 871.

Kevin Robert McDermott, Troy Morris, Schottenstein Zox & Dunn, Columbus, OH, for plaintiff.

Darius Nariosang Kandawalla, Judith French, Ohio Attorney General, Business & Government Regulation Section, Columbus, OH, Karen L. Killian, Ohio Attorney General, Corrections Litigation, Columbus, OH, for defendant.

Donald Byron Leach, Jr., John Young, Buckingham Doolittle & Burroughs, Columbus, OH, for defendant and for intervenor.

## OPINION AND ORDER

GRAHAM, District Judge.

### I.

On November 2, 1998, this court struck down Ohio Revised Code § 123.151, which provides race-based preferences in the award of state construction contracts, holding that it violated the Equal Protection Clause of the United States Constitution. Two weeks earlier, the United States District Court for the Northern District of Ohio, likewise, found this Ohio law unconstitutional when it was relied upon to support a state mandated set-aside program adopted by the Cuyahoga Community College. *See F. Buddie Contracting, Ltd. v. Cuyahoga Community College District*, 31 F.Supp.2d 571 (N.D.Ohio 1998). The state defendant's appealed this court's decision to the United States Court of Appeals for the Sixth Circuit. Thereafter, the Supreme Court of Ohio held, in the case of *Ritchey Produce Co., Inc. v. State of Ohio, Department of Administrative Service*, 85 Ohio St.3d 194, 707 N.E.2d 871 (1999), decided on April 7, 1999, that Ohio Rev.Code § 125.081, which provides race-based preferences in the state's purchase of nonconstruction-related goods and services, is constitutional.

While this court's decision related to construction contracts and the Ohio Supreme Court's decision related to other goods and services, the decisions cannot be reconciled. The state relied on the same evidence and the same legal arguments to justify both programs. Indeed, both statutes were enacted as part of a 1980 Minority Business Enterprise ("MBE") Act. In *Ritchey Produce*, the Ohio Supreme Court, without elaboration, simply noted that its conclusions were "at odds" with the rationale of this court's order of November 2, 1998.

■ The action of the Supreme Court of Ohio in deciding *Ritchey Produce*, while the fundamental issues relating to the constitutionality of Ohio's 1980 MBE Program were pending before the United States Court of Appeals for the Sixth Circuit, has created an unfortunate tension between the state and federal judicial systems. This court, however, while it has the highest respect for the Supreme Court of Ohio, is not bound by state court decisions on issues involving the United States Constitution. While the state courts have the jurisdiction to decide such issues, the federal courts have primacy in deciding questions of federal law. *See England v. Louisiana State Board of Medical Examiners*, 375 U.S. 411, 415–16, 84 S.Ct. 461, 11 L.Ed.2d 440 (1964).

It is all the more unfortunate that the Ohio Supreme Court undertook to decide whether the state of Ohio had a compelling interest to grant race-based preferences when the plaintiff in *Ritchey Produce* had chosen not to contest that issue and there was no party before the court who was effectively litigating the interests of Ohio's non-minority businesses on that critically important issue. This court believes that deciding extremely important constitutional issues in a vacuum of the adversarial process can—and in the *Ritchey Produce* case did—lead to error.

In the aftermath of this court's decision and the decision of the Northern District of Ohio in *Buddie Contracting*, the state of Ohio dismantled its system of race-based preferences in all state purchasing; not only construction, but goods and services as well. Now, as a result of the Ohio Supreme Court's decision in *Ritchey Produce*, the state is in the process of reestablishing its clearly unconstitutional fifteen percent race-based quota in goods and services.

On April 8, 1999, the state defendants moved this court to stay its order of November 2, 1998 in light of the Ohio State Supreme Court's decision in *Ritchey Produce*. The state's motion has given this

court the opportunity to reconsider its decision of November 2, 1998, and to carefully examine the reasons given by the Supreme Court of Ohio for reaching the opposite result in *Ritchey Produce*. This court has reached the firm conclusion that its original decision was correct, and that a stay of its order would only serve to perpetuate a blatantly unconstitutional program of race-based benefits. This court is convinced that *Ritchey Produce* was wrongly decided by the Ohio Supreme Court. The court will begin by summarizing its reasons for these conclusions and will discuss them in greater detail in the following sections of this Opinion and Order.

*Ritchey Produce* was wrongly decided because:

1. Ohio's program of race-based preferences in the award of state contracts is unconstitutional because it is unlimited in duration. *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 238, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995) (A race-based remedy must be appropriately limited such that it "will not last longer than the discriminatory effects it is designed to eliminate.").

2. A program of race-based benefits cannot be supported by evidence of discrimination which is now over twenty years old. *Brunet v. City of Columbus*, 1 F.3d 390, 409 (6th Cir.1993), *cert. denied sub nom Brunet v. Tucker*, 510 U.S. 1164, 114 S.Ct. 1190, 127 L.Ed.2d 540 (1994) (Fourteen-year-old evidence of discrimination "too remote to support a compelling governmental interest.")

3. The state court found that there was a "severe numerical imbalance in the amount of business the state did with minority-owned enterprises," *Ritchey Produce*, 85 Ohio St.3d at 262, 707 N.E.2d at 919, based on its uncritical acceptance of essentially worthless calculations contained in a twenty-one-year-old report, which miscalculated the percentage of minority-owned businesses in Ohio and misrepresented data on the percentage of state purchase contracts they had received, all of which

was easily detectable by examining the data cited by the authors of the report. *See* pp. 6–7, and Section IV(e), *infra*.

4. The state court failed to recognize that even the incorrectly calculated percentage of minority-owned businesses in Ohio (6.7 percent) bears no relationship to the 15 percent set-aside goal of the Ohio Act. *United States v. Paradise*, 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987). (In assessing the appropriateness of race-conscious relief, courts have generally looked to several factors, including the relationship of the goals to the relevant market.).

5. The state court applied a clearly incorrect rule of law when it announced that Ohio's program of race-based preferences in state contracting must be upheld unless it is clearly unconstitutional beyond a reasonable doubt. The Supreme Court of the United States has said, to the contrary, that all racial classifications are highly suspect and must be subjected to strict judicial scrutiny. *City of Richmond v. J.A. Croson*, 488 U.S. 469, 494, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989); *Adarand*, 515 U.S. at 236, 115 S.Ct. 2097.

6. The evidence of past discrimination which the Ohio General Assembly had in 1980 did not provide a firm basis in evidence for a race-based remedy. *Croson*, 488 U.S. at 500, 109 S.Ct. 706 (The state must have a "strong basis in evidence for its 'conclusion that remedial action was necessary.' ").

In *Ritchey Produce*, the Supreme Court of Ohio summarized its understanding of the evidence the Ohio legislature had when it enacted the MBE Act of 1980 as follows:

When Ohio's General Assembly enacted the 1980 MBE program, the General Assembly had a wealth of evidence before it. The evidence considered by the General Assembly included past judicial decisions confirming the existence of discrimination in state contracting and establishing the state's acquiescence in such discriminatory practices, executive

findings of discrimination in state contracting opportunities, administrative findings of the need for affirmative action, testimony of opponents and proponents of minority set-asides, and a host of relevant statistical evidence showing the severe numerical imbalance in the amount of business the state did with minority-owned enterprises. The evidence that was before the General Assembly showed, *inter alia,* a gross statistical disparity between the number of qualified MBEs in Ohio and the number of contracts awarded to Ohio's minority businesses. The 1978 task force report indicated, among other things, that minority businesses constituted approximately seven percent of all Ohio businesses, but that minority businesses were receiving less than one-half of one percent of state purchasing contacts. A study by ODAS also indicated a disparity in the general construction contracts awarded to minority businesses, as did a report issued by Legislative Budget Office.

*Ritchey Produce,* 85 Ohio St.3d at 262, 707 N.E.2d at 919.

This description of the evidence bears little resemblance to the actual facts. The past judicial decisions considered by the General Assembly consisted of two cases. The first was a 1967 federal court decision which involved discrimination by labor unions against black construction workers. The court did not consider, much less make any findings on the issue of discrimination in the award of state contracts. The second case was an unreported, unappealed decision of an Ohio trial court in a case which was tried before the requirements of strict scrutiny were established by the Supreme Court of the United States, and which was tried on the theory, since rejected by the nation's highest Court, that evidence of past societal discrimination was sufficient to support race-based remedies. The court found that "there exists in the awarding of state contracts a discrimination against [specified minority owned businesses]," but neglected to say when, how, or by whom the

discrimination was practiced, and failed to find, as the law now requires, that the state itself had been an active or passive participant in it. *See Ohio Building Chapter, AGC v. Jackson,* Franklin C.P. Nos. 78CV–05–2343 and 79CV–01–247 (September 28, 1979), filed herein as State's Exh. E, p. 5.

There are no "executive findings of discrimination in state contracting opportunities," *Ritchey Produce,* 85 Ohio St.3d at 262, 707 N.E.2d at 919, in the materials cited by the Ohio Supreme Court. The only executive order referred to in *Ritchey Produce* is a 1972 order of Governor Gilligan which relates to equal opportunity in employment, not the award of state contracts. Likewise, this court has not found any administrative findings of discrimination in the award of state contracts in the materials cited by the Ohio court.

There was no evidence of the number of MBEs in Ohio which were qualified to enter into contracts to sell goods and services to the state. Instead, there was only evidence of the total number of all minority-owned businesses in Ohio, eighty percent of which did not have even one employee and which included large numbers of sole proprietorships, such as barber shops, beauty shops, shoe repair shops, neighborhood carry-outs, and other "mom and pop"-type operations with no employees—businesses which would have neither interest in, nor ability to perform contracts to supply goods and services to the state of Ohio. There was no evidence of a "gross statistical disparity" between the number of qualified MBEs in Ohio and the contracts awarded to them. There was, in fact, no data on the percentage of all state purchasing contracts awarded to minority-owned firms. The Ohio Supreme Court relied on a statement in the 1978 report of the Attorney General's Task Force On Minorities In Business that minority businesses "received less than one-half of one percent of all state purchase contracts" from 1975 to 1977, and overlooked the fact that the data cited by the authors of the

report did not include *all* state purchase contracts, but only Department of Transportation construction contracts.[1] *See* Section IV(e), *infra.*

The assertion that minority businesses constituted approximately seven percent of all Ohio businesses was the result of a gross statistical error, also overlooked by Ohio's high court, in which the total number of Ohio minority-owned businesses, including those with and without employees, was compared with the total number of Ohio businesses with employees—a classic case of comparing apples to oranges. *See* Section IV(e), *infra.*

The ODAS and Legislative Budget Office ("LBO") studies cited by the court reported only the percentage of the dollar value of prime construction contracts awarded to minority-owned firms. They contained no information on the number of qualified minority-owned construction firms. These studies did not even attempt to show a disparity between the percentage of the contract dollars awarded to minority firms and the number of such firms.

Justice Douglas, speaking for all of the justices, except Justice Cook, who concurred only in the Court's judgment, assured the citizens of Ohio that the court's *Ritchey Produce* decision was based "upon a careful review of the state's arguments." *Ritchey Produce,* 85 Ohio St.3d at 254, 707 N.E.2d at 914. He called the above-described evidence a "wealth of evidence." *Id.* at 262, 707 N.E.2d at 919. Quite clearly, it is not. A careful analysis of the material referred to by the state court demonstrates, to the contrary, that it is wholly insufficient to support the state court's conclusion.

In *Ritchey Produce,* the Ohio Supreme Court called Ohio's MBE program a "benign or remedial race-based measure[.]" *Ritchey Produce,* 85 Ohio St.3d at 274, 707

N.E.2d at 928. The evidence in the instant case, however, revealed that far from being benign, this program, which was supposedly intended to remedy past discrimination against minority businesses, has instead become an instrument of reverse discrimination against non-minority businesses. The problem here begins with the fact that the set-aside goals of the Ohio MBE Act bear no relationship to the number of minority businesses which are ready, willing, and able to enter into contracts with the state. In the present case, the state conceded that only those businesses with at least one employee would be likely to have the interest or ability to supply goods and services to the state of Ohio. Based on the census data available to the Ohio General Assembly in 1980, minority-owned businesses with at least one employee constituted only one percent of such Ohio businesses. Even this figure probably overstates the percentage of MBEs qualified to provide some of the services covered by the Act. For example, firms seeking prime construction contracts must be able to provide performance bonds. But, accepting this number as a hypothetical estimate of the availability of MBEs, it follows that the percentages set aside for them are at least five times what they should have been for prime construction, seven times what they should have been for construction subcontracting, and fully fifteen times what they should have been for other goods and services.

In order to achieve these unrealistic goals, state agencies have resorted to 100 percent set-asides in certain trades, services, and commodities, thereby completely excluding non-minority firms from the opportunity to sell their goods and services to these agencies. For example, for a number of years, it was the policy of The Ohio State University to reserve 100 percent of its painting contracts for minority

---

1.  There was no data on the number of minority-owned firms which were qualified to undertake prime contracts for the construction of roads and bridges in the mid-1970s, but they were probably few in number. Perhaps they were in fact less than one-half of one percent of all such firms—if so, there would have been no disparity in the percentage of the contracts they received.

firms. The University's list of categories of goods and services reserved solely for minority-owned firms was ultimately expanded to almost forty. For these tradesmen and businessmen, the University's policy was, "Whites and other non-minorities need not apply."

Even worse is the fact, revealed by the evidence in this case, that the state does not consider these unrealistically high goals as in any way limiting the percentage of state purchases to be set aside for minority-owned businesses. In fact, the state has encouraged its purchasing departments to exceed those goals and, in many instances, they have done so.

Finally, it is sadly apparent that the assumption that dollars set aside for minority firms would flow to economically disadvantaged businesses is probably unfounded. A 1995 study of state affirmative action programs revealed that eighty percent of the dollar value of all contracts set aside for minority firms were awarded to only five percent of the MBEs registered in the program. Statewide, a mere handful of minority-owned businesses, about eighty firms, received eighty percent of the dollar value of the contracts set aside that year. In 1995, the state set aside 228.3 million dollars in state contracts for bidding by minority firms only and another fifty-six million dollars was set aside by the state's colleges and universities. In the instant case, Ohio's Department of Rehabilitation and Correction set aside a ten million dollar contract for the construction of an administration building at a new prison being built in Toledo, Ohio, and was prepared to award that contract to the Sherman R. Smoot Company, a minority-owned firm which is listed among the nation's 400 largest construction companies, with 1997 revenues reported in excess of 110 million dollars.

■ When financially rewarding state contracts are allocated on the basis of race, some business owner loses, not because her bid was too high or because he was less qualified, but because of the color of his or her skin. The loser, whether he be white or, as in the case of Mr. Ritchey, Lebanese, or whatever race he may be, may never in his lifetime have harbored a discriminatory thought. The economic needs of his business may be no less, or perhaps even much more than that of the business owner of the preferred race who receives the desired contract. It is precisely because this kind of an affirmative action program places the burden of paying for past discrimination, not upon society as a whole, but upon individual business owners who may have never been guilty of discrimination, that such programs are disfavored by the courts. This is why the Supreme Court warned in *Croson:*

Absent searching judicial inquiry into the justification for such race-based measures, there is simply no way of determining what classifications are "benign" or "remedial" and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics....

\*　\*　\*　\*　\*　\*

Classifications based on a race carry a danger of stigmatic harm. Unless they are strictly reserved for remedial settings, they may in fact promote notions of racial inferiority and lead to a politics of racial hostility....

*Croson,* 488 U.S. at 493, 109 S.Ct. 706.

In *Adarand,* Justice Thomas observed:

... So-called "benign" discrimination teaches many that because of chronic and apparently immutable handicaps, minorities cannot compete with them without their patronizing indulgence. Inevitably, such programs engender attitudes of superiority or, alternatively, provoke resentment among those who believe that they have been wronged by the government's use of race....

*Adarand,* 515 U.S. at 241, 115 S.Ct. 2097.

Ohio's program of race-based quotas in state contracting is anything but benign.

## II.

It is now well settled that all racial classifications imposed by federal, state, or local government must be analyzed under strict scrutiny; they must serve a compelling state interest and they must be "narrowly tailored" to serve that interest. *Adarand Constructors, Inc. v. Pena,* 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995); *City of Richmond v. J.A. Croson Co.,* 488 U.S. 469, 109 S.Ct. 706, 102 L.Ed.2d 854 (1989). In order to show a compelling state interest, the government actor must have a "strong basis in evidence for its conclusion that remedial action was necessary," *Croson,* 488 U.S. at 500, 109 S.Ct. 706. This requires evidence that the government actor itself was an active or passive participant in the discrimination. *See Croson,* 488 U.S. at 490–493, 109 S.Ct. 706.

Approximately two years after it became law, the constitutionality of the construction contract provisions of the Ohio MBE Act was challenged in an action filed in this court. *See Ohio Contractor's Ass'n v. Keip,* Case No. C–2–82–446 (S.D.Ohio, December 15, 1982). In *Keip,* the state of Ohio produced all of the evidence it had to show that the Act was supported by a compelling state interest to remedy the effects of past discrimination against minority contractors. Judge Kinneary reviewed and analyzed that evidence in a thirty-five page opinion. Although the law was then unsettled as to the standard of review, Judge Kinneary's legal analysis closely resembles the analysis the United States Supreme Court would later adopt, *i.e.,* strict scrutiny. *See, e.g., Adarand; Croson.* He considered and applied the relevant elements of the "narrow tailoring" requirement of strict scrutiny, including duration, burden on non-minority contractors, flexibility, and consideration of less intrusive means. He found "scant support" for the existence of a compelling state interest to justify a race-based remedy. He concluded that regardless of the existence of a sufficient state interest, the Ohio MBE Act was, nevertheless, constitutionally defective because it was not rea-sonably tailored to the goal of remedying prior discrimination. *See Keip,* S.D.Ohio No. C–2–82–446, pp. 28–34. On appeal, the Sixth Circuit Court of Appeals, in a split decision, upheld the Ohio Act. *See Ohio Contractors Ass'n v. Keip,* 713 F.2d 167 (6th Cir.1983). Judge Engle filed a strongly-worded dissent in that case. When the Sixth Circuit decided *Keip,* it applied the wrong standard of review. At that time, the court was applying a relaxed standard of review, an error which was corrected by the Supreme Court of the United States when it reversed the Sixth Circuit in *Wygant v. Jackson Board of Education,* 476 U.S. 267, 106 S.Ct. 1842, 90 L.Ed.2d 260 (1986). In *Michigan Road Builders Association, Inc. v. Milliken,* 834 F.2d 583, 587 (6th Cir.1987), *aff'd,* 489 U.S. 1061, 109 S.Ct. 1333, 103 L.Ed.2d 804 (1989), the appellate court acknowledged that it had applied the wrong standard of review in its earlier cases including, specifically, *Keip.* "The Supreme Court left no doubt that the standard of review previously employed by this circuit in racial and ethnic affirmative action cases was inappropriate." *Id.* at 588. *See also Aiken v. City of Memphis,* 37 F.3d 1155, 1162 (6th Cir.1994).

The Ohio MBE Act of 1980 has lead a charmed existence for nearly twenty years. It should have died in 1982 when Judge Kinneary found it unconstitutional in *Keip,* but it survived when the state appealed because the Sixth Circuit applied the wrong standard of review. Later, its supporters took courage when it received favorable mention in *Croson.* In *Croson,* Justice O'Connor, speaking for the Court, rejected the proposition that a finding of disparity in the award of city construction contracts could be based on a disparity between the percentage of contracts awarded to minority firms and the percentage of the minority population of the city, noting that the city of Richmond "does not even know how many MBE's in the relevant market are qualified to undertake prime or subcontracting work in public construction contracts". 488 U.S. at

502, 109 S.Ct. 706. She referred to *Keip*, 713 F.2d 167, noting that, in *Keip*, the Sixth Circuit had relied "on the percentage of minority *businesses* in the State compared to the percentage of state purchasing contracts awarded to minority firms...." *Id.* (emphasis in original). It is not clear whether Justice O'Connor was saying this was sufficient, or simply that it was better than what the city of Richmond had done. In light of her statement that the city of Richmond did not even know how many firms in the relevant market were qualified to undertake public construction contracts, it is clear that she did not mean that a set-aside program for construction contracts could be supported by a disparity analysis based on all minority-owned businesses. If Justice O'Connor was suggesting that a set-aside program for other kinds of state purchasing could be supported by disparity between the number of minority-owned businesses and the percentage of state purchase contracts awarded to them, she certainly was not aware that the state of Ohio's calculation of the percentage of minority businesses in *Keip* was completely wrong. Ironically, the situation here is even worse than it was in *Croson*, where the city of Richmond attempted to justify a set-aside goal of thirty percent on the grounds that minorities constituted fifty percent of the city's population. Here, Ohio's goal of fifteen percent for goods and services is completely unexplained, but it does bear a rather suspicious correlation to the minority population of the state, which is about twelve percent of all Ohio citizens. Bureau of the Census, U.S. Dep't of Commerce, Pub. No.1990 CP–1–37, 1990 Census of Population: General Population Characteristics, Ohio 37–27 (1992). So, in Richmond, a contracting goal which was twenty percentage points less than the city's minority population was struck down, while here, the state seeks to justify a set-aside which actually exceeds the percentage of the minority population of the state.

In the trial of the instant case, when the state was called upon to produce evidence of a compelling state interest, it an-

nounced that it would defend the constitutionality of the Ohio MBE Act on the basis of the record made in 1982, in the trial of *Keip*. The state conceded that it had no additional evidence of discrimination against minority contractors, and admitted that during the nearly two decades the Act has been in effect, it has made no effort to determine whether there is a continuing need for a race-based remedy. In the trial of this case, the state presented no evidence that it had been an active or passive participant in discrimination against minority firms in the award of prime construction contracts, or that it had participated directly or indirectly in discrimination by prime contractors in the award of subcontracts. Indeed, the state officials most likely to be aware of such discrimination, if it existed, said that to the best of their knowledge, there was none. The state relied entirely on the evidence which the General Assembly had in 1980, which is now over twenty years old and far too stale to support the continued existence of a program of race-based preferences.

After hearing the evidence in the case and after reviewing Judge Kinneary's analysis of the evidence the state produced almost seventeen years ago in the trial of *Keip*, the unconstitutionality of Ohio's MBE Act was so clear to this court that it declared the Act unconstitutional from the bench at the conclusion of its October 1998 hearing. *See* Bench Decision October 28, 1998, Tr. 351–367.

### III.

An analysis of *Ritchey Produce* should begin with these important observations: 1) the plaintiff never challenged the state's compelling interest for a race-based remedy; and 2) no trial was held in which the state was called upon to produce evidence to support a compelling interest for a race-based remedy. In *Ritchey Produce,* the plaintiff did not directly challenge the constitutionality of the set-aside program; instead, it sought to participate in the pro-

gram. Ritchey Produce claimed that it was an economically disadvantaged business enterprise and that the Ohio statute should be interpreted broadly enough to benefit any business, regardless of race, which could show that it was economically disadvantaged. Ritchey Produce argued in the alternative that it was entitled to participate in the program because it was solely owned by a person of Lebanese descent, and that such persons are Orientals and entitled to the benefits of the program because of their race. Ritchey Produce never challenged the state's compelling interest to clothe the four classes of minorities mentioned in the statute with a presumption of economic disadvantage. In its brief in the Supreme Court of Ohio, Ritchey Produce said:

> ... Ritchey Produce did not challenge the MBE statute's validity, but instead challenged how ODAS reversed its policy and decertified Ritchey Produce based on race *per se*. As the lower courts never considered either a record or arguments on the validity of the State's underlying interest in creating its MBE program, the State improperly raises these issues before this Court.

Merit Brief of Appellee Ritchey Produce Company, Inc., p. 9, Addendum C, filed herein April 14, 1999.

Nadin F. Ritchey, the sole shareholder of Ritchey Produce, is a naturalized American citizen who was born in the country of Lebanon. In 1990, he applied to the Ohio Department of Administrative Services ("ODAS") to have his business certified as a minority-owned enterprise. He indicated on his application that his company was an "Oriental" business. He was granted an MBE certificate and was awarded a two million dollar set-aside contract to supply fresh fruit and vegetables to state institutions. Ritchey's MBE certificate was renewed annually until 1995, when ODAS notified him that his application was rejected on the grounds that he was not a member of any group recognized as a minority business enterprise under Ohio Rev. Code § 122.71(E)(1) Ritchey filed an administrative appeal asserting that anyone born in a country east of the Mediterranean should be considered Oriental. In the alternative, Ritchey argued that the agency's "reinterpretation" of the word "Oriental" should not be applied retroactively because this would unconstitutionally impair his existing contract with the state of Ohio. The hearing examiner rejected both of these arguments and Ritchey appealed to the Common Pleas Court of Franklin County. There, Ritchey conceded that he was not Oriental and argued instead that Ohio's set-aside program should be construed to benefit any business which can show that it is economically disadvantaged. He argued that § 122.71(E)(1) merely created a rebuttable presumption that any business falling within the four specified racial classifications is economically disadvantaged. Ritchey's appeal was initially heard by a magistrate who agreed with his argument and also concluded that the Supreme Court's decision in *Adarand* required that the focus of the Ohio statute must be on economic disadvantage and not race *per se*. *See* Appendix to Brief of Appellant State of Ohio, Addendum B, filed herein April 14, 1999. The state of Ohio filed objections to the magistrate's decision, causing it to be reviewed by Common Pleas Judge Daniel T. Hogan. Judge Hogan adopted and affirmed the magistrate's decision, agreeing that *Adarand* required that Ohio's MBE program should be open to any citizen, regardless of race, who could establish that his or her business was economically disadvantaged. *See* Appendix to Brief of Appellant State of Ohio, Addendum B, filed herein April 14, 1999. The state appealed Judge Hogan's decision to the Franklin County Court of Appeals. The court of appeals, like the court below, did not address the issue of whether the state had shown a compelling state interest to justify its set-aside program. Agreeing with Judge Hogan, the court of appeals held that the program was not "narrowly tailored." The court of appeals reasoned that the statute was both under-inclusive and over-inclusive because there may be economically disadvantaged

**752**

businesses which are excluded simply because of their race, while at the same time others which are not economically disadvantaged are eligible to participate because of their race. *See* Appendix to Brief of Appellant State of Ohio, Addendum B, filed herein April 14, 1999.

Because Ritchey conceded that the state of Ohio had a compelling interest to grant race-based preferences to the four specified minorities, the state was not called upon to present any evidence to support its set-aside program. As a result, there was no evidentiary record which the Supreme Court of Ohio could review to determine whether the state had demonstrated a "strong basis in evidence for its conclusion that remedial action was necessary." *Croson,* 488 U.S. at 510, 109 S.Ct. 706 (quoting *Wygant,* 476 U.S. at 277, 106 S.Ct. 1842). When the state appealed to the Supreme Court of Ohio, that court had several options available to it. Like the lower courts, it could have limited its decision to the interpretation of Ohio's MBE Act and the "narrowly tailored" element of strict scrutiny, particularly whether *Adarand* required all affirmative action plans to be based on economic disadvantage. The Ohio Supreme Court's rulings that Ohio's MBE Act was based on race *per se* and that *Adarand* did not prohibit a race-conscious remedial program would have resolved all of the issues raised by Ritchey Produce. Thus, the court could have deferred consideration of the crucial issue of whether the state had a compelling interest for a race-based remedy until it had a litigant before it who was effectively advocating the interests of Ohio's non-minority businesses by challenging the state's evidence of a compelling interest. On the other hand, if the court felt that it was necessary to decide the issue of compelling

state interest, it had a second option, namely to remand the case to the trial court for a trial in which the state would be called upon to produce its evidence of a compelling state interest.

■ The Ohio Supreme Court did not exercise either of these options. Instead, it undertook to decide whether Ohio's program of race-based preferences in state contracting was supported by a compelling state interest. In the absence of an evidentiary record, it undertook to decide this issue by examining historical information it was able to glean from the state's briefs. Thus, Ohio's high court based its decision, not on a factual record developed in an adversarial hearing, but on information it gathered from the state's briefs.[2] This approach cannot be reconciled with the requirement of strict scrutiny. As Justice Powell said in *Wygant:*

> Evidentiary support for the conclusion that remedial action is warranted becomes crucial when the remedial program is challenged in court ... In such a case, the trial court must make a factual determination that the employer had a strong basis in evidence for its conclusion that remedial action was necessary. The ultimate burden remains with [the plaintiff] to demonstrate the unconstitutionality of an affirmative-action program. But unless such a determination is made, an appellate court reviewing a challenge by nonminority employees to remedial action cannot determine whether the race-based action is justified as a remedy for prior discrimination....

*Wygant,* 476 U.S. at 277–278, 106 S.Ct. 1842. *See Brunet,* 1 F.3d at 405 ("[T]he District Court did not err in placing a burden of production upon the City and

---

**2.** Justice Douglas, speaking for the Ohio Supreme Court, with the exception of Justice Cook, who concurred in the judgment only, stated:

> Indeed, *upon a careful review of the state's arguments in this case,* it clear [sic] to us that the General Assembly had a "strong basis" in evidence to support its conclusion

that Ohio's program was necessary to redress a pattern of discriminatory exclusion of minorities from state contracting opportunities and, thus, had a compelling governmental interest for adopting the MBE program.

*Ritchey Produce,* 85 Ohio St.3d at 254, 707 N.E.2d at 914 (emphasis added).

the ... plaintiffs to show evidence of past discrimination[.]"). *See also Aiken,* 37 F.3d at 1162 ("[T] he party defending the plan bears the burden of producing evidence that the plan is constitutional.")

## IV.

In *Ritchey Produce,* the Supreme Court of Ohio found that the state "had a 'strong basis in evidence' for finding that remedial action was necessary to ameliorate the effects of identified racial discrimination in which the state itself had either actively or passively participated." *Ritchey Produce,* 85 Ohio St.3d at 260, 707 N.E.2d at 918. The "evidence" the court relied upon in reaching this conclusion consisted of two court decisions, statistical information, a January 1972 executive order issued by Ohio Governor, John J. Gilligan, and a 1978 report by a Task Force On Minorities In Business, established by Ohio Attorney General, William J. Brown.

### a) *Ethridge v. Rhodes*

The first court decision the Ohio Supreme Court relied upon was *Ethridge v. Rhodes,* 14 Ohio Misc. 43, 268 F.Supp. 83 (1967). *Ethridge* was a class action brought on behalf of black construction workers who had been denied admittance to labor unions for the construction trades. Plaintiffs sought to enjoin the state of Ohio from entering into construction contracts with companies which limited their hiring to members of unions which had excluded blacks. The court found that the state was aware of a pattern of discrimination by the unions in membership and referral of black tradesmen, and that the state was aware that its efforts to eliminate this discrimination had been ineffectual. The court found that the state had become a joint participant in a pattern of racially discriminatory conduct "by placing itself in a position of interdependence with private individuals ... acting under contract with unions that bar Negroes ..." *Id.* at 87.

■ *Ethridge* may be relevant as corroborative evidence of the state's role as a passive participant in discrimination against blacks, but it is not probative on the issue of whether the state had discriminated against minority-owned firms in the award of state construction contracts. *Ethridge* involved discriminatory membership practices of labor unions, not the award of state construction contracts. While it might be argued that discrimination by labor unions may have contributed to a paucity of black construction firms in the 1970s, the Supreme Court of the United States has held that speculation about the results of past societal discrimination may not be used to justify race-based preferences in the award of public contracts. *See Croson,* 488 U.S. at 499, 109 S.Ct. 706.

### b) Governor Gilligan's Executive Order

■ In January 1972, Ohio's then governor, John J. Gilligan, issued an executive order directing all state agencies to eliminate discriminatory barriers to employment. This executive order was directed against employment discrimination by contractors performing public works contracts for the state of Ohio, and was apparently issued to fulfill the requirements of a preliminary consent order entered as part of the settlement of the case of *Welch v. Rhodes,* Civil No. 67–249 (S.D.Ohio 1967), which sought to expand the injunction entered in *Ethridge.* In *Ritchey Produce,* the Supreme Court of Ohio stated that "[t]he purpose of this order was, among other things, to increase minority participation in state contracting opportunities." *Ritchey Produce,* 85 Ohio St.3d at 255, 707 N.E.2d at 915. This is true only in the sense that the order sought to increase the hiring of minorities by firms engaged in state contracting. The order says nothing about the award of state construction contracts. It contains no findings that the state had discriminated in the award of construction contracts. Indeed, it is completely silent on that issue. Thus, Governor Gilligan's Executive Order of January 27, 1972, like the decision in *Ethridge,* has no probative value on the issue of whether the state of Ohio had a compelling interest to remedy discrimination in the award of state construction contracts.

There is a further reference to Governor Gilligan in *Ritchey Produce*. The court noted that Governor Gilligan had testified in the trial of *Keip*, where he said that, during his administration, he was aware of the difficulties experienced by minority businesses and small businesses in obtaining state contracts, and that the cause of the difficulty was "the existence of an old boys' club sort of relationship' between state officials and a number of established and reputable firms with a good deal of experience that 'tended to get the lion's share of the business.'" *Ritchey Produce*, 85 Ohio St.3d at 256, 707 N.E.2d at 915. However, Judge Kinneary's opinion in *Keip* further states that "[b]ased on his responses to questioning at trial, Governor Gilligan was not aware of, nor did he cause any investigation into, allegations that state officials discriminated against minority contractors during his administration." *Keip*, S.D. Ohio No. C–2–82–446, p. 11.[3]

### c) *Ohio Building Chapter, AGC v. Jackson*

The second court decision relied upon in *Ritchey Produce* was *Ohio Building Chapter, AGC*, which arose out of a legal challenge to minority set-aside provisions contained in a biennial capital improvements appropriation bill passed by the Ohio General Assembly in September 1977. This bill contained no findings that the state had discriminated against minority contractors. In an unreported decision, Common Pleas Judge George Tyack upheld the constitutionality of the bill. Judge Tyack did not render separate findings of fact and conclusions of law. A transcript of the testimony and other evidence he relied upon is no longer available. In a six-page decision, Judge Tyack's only reference to discrimination in the award of state contracts was one cryptic sentence:

> This court finds from the evidence submitted that there exists in the awarding of state contracts a discrimination against the minority groups specified in Sub House Bill No. 618.

*Ohio Building Chapter, AGC*, Franklin C.P. Nos. 78CV–05–2343 and 79CV–01–247, filed herein as State's Exh. E. Judge Tyack's decision was handed down on September 28, 1979, one day before the expiration of the biennial appropriation which contained the challenged set-aside provisions. Not surprisingly, there was no appeal.

It is impossible to determine from Judge Tyack's decision what evidence he relied upon or just what he meant when he said "there exists … a discrimination." He did not identify the discriminator or discriminators. It is particularly significant that he did not make an express finding that the state of Ohio was a participant in the discrimination.

Although there is no transcript of the evidence adduced in *Ohio Building Chapter, AGC*, the briefs filed by the parties are available and they do shed some light on what the evidence was. In a section of the plaintiff's brief entitled "The Facts," the following statements appear:

> The Department of Administrative Services admists [sic] that it maintains no records with respect to the race, sex, or ethnic backgrounds of those who submit bids for construction contracts. Nor does it have any records with respect to the owners of the stock when the bidder is a corporation.
>
> \*       \*       \*       \*       \*       \*
>
> Although there is some evidence that employees of the Department of Administrative Services know relatively few Minority Business Enterprises who have successfully competed for public contracts, there has been an abundance of evidence that most contractors who qualify as MBEs are relatively small and lack the financial resources necessary to compete and perform state jobs. Finan-

---

**3.** Governor Gilligan's testimony in *Keip* was given in October, 1982. There is no evidence that he provided any testimony to the Ohio Legislature during its deliberations which culminated in the enactment of Ohio's set-aside program in 1980.

cial resources are necessary because the contractor must bear the cost of labor and materials for at least 30 days and must provide the statutory bonds. These same factors affect most contractors who are not MBEs from competing and performing state work.

There has been no evidence of prior discrimination by the state against contractors who qualify as MBEs.

The defendant has not even attempted to show "a compelling governmental interest for classification" except for blacks. The evidence falls far short of what is required to show a compelling interest there for [sic] it has focused on problems with labor unions and employment, not with black contractors being denied the right to bid by the state.

Brief of Plaintiffs, Franklin C.P. Nos. 78CV–05–2343 and 79CV–01–247, filed herein as Defendant State of Ohio Third Submission of Materials, Addendum K, Item 10, pp. 2–3. The state's case on the issue of the constitutionality of the set-aside provisions of the bill was presented by special counsel, Otto Beatty, Jr. In his brief, Mr. Beatty did not challenge the plaintiff's characterization of the evidence before the court as quoted above. His own summary of the evidence was as follows:

Plaintiff will not deny that minority business enterprises engaged in construction contracting (that is, the open class who are beneficiaries of Defendants [sic] actions now before the Court) receive now, and have received in the past, little or no business from the state. This is further evidenced by the statistics and data prepared by Mr. Burton D. Cooper, EEO Program Supervisor for the Department of Administrative Services and submitted as Defendant's Exhibits K–1, K–2, K–3, K–4, K–5, L, M, N, O, and P. Plaintiffs cannot deny that these minority businesses have in the past been, and are still today, victims of direct and indirect invidious discrimination. This discrimination may have been part of a general, diffused commercial and societal pattern of discrimination.

Nevertheless, such discrimination is in direct contradiction to the spirit, language, and policy of the laws of Ohio. Supplemental Brief of Special Counsel, Franklin C.P. Nos. 78CV–05–2343 and 79CV–01–247, Defendant State of Ohio Third Submission of Materials, Addendum K, Item 11, pp. 3–4. Mr. Beatty continued, as follows:

Defendants have already shown in testimony and documentary evidence presented before the Court, that the numbers of minorities in the construction trades in the State of Ohio has been, and is exceedingly low. Furthermore, defendants have shown that this dilemma was not due to a lack of qualified minorities but rather to technical discriminatory road blocks such as inability to obtain surety bonds and contracts, which effectively closed employment opportunities to minority contractors....

Supplemental Brief of Special Counsel, *supra*, p. 16. At page 19 of his brief, Mr. Beatty argued as follows:

The plaintiffs would have the Court to believe that the state's affirmative action -Set Aside Program cannot be justified by any need to overcome past discrimination because the State of Ohio has not been found to have engaged in discrimination. That proposition is erroneous for two reasons: first, the State is not limited to correcting the effects of its own discrimination, but it can take into account the consequences of discrimination elsewhere in society; second, institutions or governmental bodies need not await judicial determinations before attempting to overcome their own discrimination.

It would make no sense to conclude that the State can take race or gender into account only to compensate for its own discrimination. Although in some cases a remedy may be needed to break down a discriminatory pattern in the administration and award of a state's public works program, whether the State previously practiced discrimination

of this sort is not a necessary part of the justification for a special affirmative action or set-aside program.

Supplemental Brief of Special Counsel, *supra*, pp. 19–20. The briefs of counsel are just as instructive for what they do not say as they are for what they do say. They do not refer to any anecdotal evidence of discrimination by state contracting officers, or by any prime contractors, banks, or lending companies. They do not refer to any disparity studies which undertook to determine the number of minority firms qualified to perform state construction contracts, what percentage they were of all such firms, and how that number compared to the percentage of state construction contracts they received. Mr. Beatty's brief refers only to the fact that minority-owned businesses had received little or no business from the state, and that the number of minorities in the construction trades in Ohio was "exceedingly low." He argues that these firms were the victims of unspecified "direct and indirect invidious discrimination" which was "part of a general, diffused commercial and societal pattern of discrimination," and "technical discriminatory road blocks such as inability to obtain surety bonds and contracts." Supplemental Brief of Special Counsel, *supra*, pp. 3–4, 16.

The statistical evidence presented in *Ohio Building Chapter, AGC,* was reviewed by Judge Kinneary during the *Keip* trial. *See Keip,* S.D. Ohio No. C–2–82–446, pp. 15–16. The Supreme Court of Ohio relied upon Judge Kinneary's summary of this evidence. *See Ritchey Produce,* 85 Ohio St.3d at 255, 707 N.E.2d at 915. The statistical evidence was compiled and presented by Burton Cooper, an Equal Employment Opportunity ("EEO") program supervisor with the Department of Administrative Services. Cooper's statistics indicated that, during the twenty-two year period from 1957 to 1979, minority contractors were awarded roughly 0.21 percent of the dollar amount of certain categories of prime capital improvement contracts. While Cooper's calculations showed that minority contractors obtained a very small portion of these contracts, he did not determine the number of minority firms who were ready, willing, and able to perform such contracts, or what percent of the total number of all such firms they represented. Without this information, it would be impossible to say whether minority firms received more or less than their fair share of the contracts. Burton's calculations represent only the first step in a statistical analysis of possible discrimination in the award of state prime capital improvement construction contracts. Standing alone, they have no probative value on the issue of discrimination in the award of such contracts.

From the above analysis, it is apparent that *Ohio Building Chapter, AGC* was tried on the theory that a program of race-based benefits could be supported by evidence that minorities had received only a small percentage of state contracts, that minority firms were disadvantaged as a result of past societal discrimination, and that it was not necessary to show that the state was a participant in the discrimination. The law was not settled when *Ohio Building Chapter. AGC* was tried. Indeed, the United States Court of Appeals for the Sixth Circuit was incorrectly applying a relaxed standard of review to race-based remedies until 1986 when the Supreme Court of the United States reversed the Sixth Circuit in *Wygant.* The evidence offered in *Ohio Building Chapter, AGC* would not satisfy the requirements of strict scrutiny, and Judge Tyack's 1979 decision has little or no probative value.

d) 1978 Report of the Ohio Attorney General's Task Force on Minorities in Business

In 1978, Ohio Attorney General William J. Brown established a Task Force On Minorities In Business to examine the relationship between state government and minority business. The task force was directed to review state laws, practices, and services relating to minority-owned businesses, and to recommend legislative,

administrative, and fiscal measures to enhance assistance to small businesses ·in general and to minority-owned businesses in particular. In October 1978, the task force issued its final report. The task force report contains various findings concerning the problems faced by small businesses in general, and minority businesses in particular. Under the heading "Capital Formation and Financing," the report states:

> ... Minority entrepreneurs often enter their business ventures with limited, if any, equity. As a result, these business owners must seek financing from alternate funding sources to sustain their business activities. However, the Task Force found that there are no effective financing sources available for Ohio minority businesses.
>
> Banking institutions are the traditional source of business borrowing. Banks prefer to lend funds for short term use to an enterprise which has an established earnings record or is fully collateralized by assets which are easily converted into cash. On the other hand, the typical credit needs of a minority business are for long term, low cost, unsecured or inadequately secured financing. As a consequence, the requirements and needs of the banking industry and the minority entrepreneur are usually incompatible—and minority businesses have been unable to secure a significant number of bank loans.

Attorney General of Ohio Task Force Report: Final Report (hereinafter "Final Report"), filed herein as State's Exh. F, pp. 8–9.

\*    \*    \*    \*    \*    \*

> Opportunities for minority businesses to broaden their markets are frustrated by such problems as their non-competitive size, lack of capital and inexperience.

Final Report, p. 13.

\*    \*    \*    \*    \*    \*

The public hearing testimony indicated that minority entrepreneurs are faced with the unique problems of minority businesses as well as traditional problems which befall most small businesses. Many minority businesses are located in the high crime, high unemployment and low income urban areas of the State. These factors lead to uncertain and unstable business environments.

Final Report, p. 15.

The task force reviewed state contract procurement statistics and procedures and reported that:

> ... Statistics reveal that minority businesses received less than one-half of one percent (.5%) of all State purchase contracts from 1975 to 1977; yet seven percent (7%) of Ohio businesses are classified as minority. Ohio minority businesses are receiving less than one-fourteenth (¼₄) of their proportionate share of State contracts.

Final Report, p. 17.

Noting that state contracts are awarded to the bidder who submits the "lowest and best bid" the task force recommended that the standard be changed to "lowest, best, and most responsive" to permit "an even greater latitude in the employment of relevant contract award criteria other than price." Final Report, p. 17. The task force also recommended that the dollar limit on noncompetitive bidding be raised from $300 to $5,000, in order to increase minority business participation. Final Report, p. 18.

The task force pointed to public hearing testimony which indicated that "[m]ost black businessmen don't have the knowledge ... to know where to go to find [State] contracts." Final Report, p. 18. The task force concluded:

> This lack of knowledge concerning the availability of State contracts is a factor which contributes to the low contract procurement percentages reflected in minority business statistics. ...

Final Report, p. 18.

In the realm of bidding procedures, the task force concluded that the state should

alter its means of preparing contract specifications by breaking contracts down "into smaller, multiple sizes." Final Report, p. 19.

In the area of bonding, the task force found:

> In order to procure a state contract, one must be able to acquire bonding, an insurance against contract failure. As a result, if one is unable to secure bonding, this individual is also unable to secure a State contract. Minority businesses have faced severe difficulties in obtaining bonding. ...

> \*     \*     \*     \*     \*     \*

> Four major problem areas which contribute to the inability of the minority contractor to secure bonding are:
>
> 1) unsatisfactory financial statements
> 2) improper estimating techniques
> 3) creditor liens (claims on the property of a contractor)
> 4) lack of knowledge of the total bonding process.

> The above cited conditions are typical problems which cause the surety industry to deny bonding to minority businesses.

> In addition, the extensive and complex paperwork which must be processed in order to acquire bonding presents problems for the minority entrepreneur. One witness stated that there are approximately sixteen different forms which must be completed before a business person can acquire a bond. Many minority entrepreneurs do not have the technical expertise and managerial skills to complete this paperwork.

Final Report, pp. 19, 20.

The task force recommended that the state establish a program to offer bonds and bonding technical assistance to minority entrepreneurs, and that the state adopt a statutory enforcement mechanism to guarantee equal bonding policies.

In the realm of capital acquisition, equity and debt, the task force found that "small minority businesses are often unable to bring together sufficient financial resources due to the lack of an established earnings track record and business credibility." Final Report, p. 23. The task force final report states:

> The public hearing record indicates that minority businesses have been unable to successfully secure a significant number of bank loans. Numerous witnesses testified that they believed that the minority entrepreneur's inability to acquire bank loans was due to the banking industry's discriminatory lending practices. In rebuttal, witnesses from banking institutions denied that Ohio bankers engaged in discriminatory practices. Bank representatives asserted that because their primary public responsibility must be to safeguard the funds of their depositors, they do not extend substantial lines of credit unless there is a high probability that the credit will be repaid in a relatively short period of time.

> Optimally, a banker would prefer to lend funds for short term use to an enterprise which has an established earnings record and is fully collateralized by assets which are easily converted into cash. On the other hand, the typical credit needs of a minority business person are for long term, low cost, unsecured or inadequately secured financing. These inconsistent requirements and needs, between the banking industry and the minority entrepreneur, cause banking institutions to be an inadequate and illusory source of financing for minority business.

Final Report, p. 24. The task force recommended that the state of Ohio create an agency which would be able to make long-term direct loans to minority business enterprises and guarantee long-term loans by banks and other financial institutions to minority business enterprises.

The Attorney General's task force appears to have conducted a serious and thorough study of the problems facing small and minority businesses in Ohio in the 1970s. While it identified a variety of

obstacles to the success of minority businesses, its report is devoid of any findings that racial discrimination played a role in the inability of minority businesses to obtain a larger share of state contracts.

e) Statistical Information

The statistical evidence of discrimination the Ohio Supreme Court relied upon to uphold the Ohio MBE Act consisted of:

1. Data prepared by ODAS for the defense of *Ohio Building Chapter, AGC v. Jackson*;
2. Data compiled by the Legislative Budget Office;
3. Disparity calculations extracted from *Keip* and the 1978 report of the Attorney General's Task Force On Minorities In Business.

*See Ritchey Produce*, 85 Ohio St.3d at 257–58, 707 N.E.2d at 916–17.

1. Data prepared by ODAS for the defense of *Ohio Building Chapter, AGC v. Jackson*

The statistical data which the state offered in defense of the temporary set-aside program challenged in *Ohio Building Chapter, AGC* was prepared in 1978 by Burton D. Cooper, EEO Program Supervisor for ODAS. *Keip*, S.D. Ohio No. C–2–82–446, p. 15. Cooper compiled records from the State Architect's Office of five categories of capital improvement contracts awarded by the state from 1957 to 1979. *Id.* He sought to determine the portion of such contracts that were awarded to MBEs. However, ODAS did not have records of the race or ethnic background of the firms that submitted bids for construction contracts. In an attempt to determine which firms were minority-owned, Cooper consulted a roster of minority contractors which ODAS had started keeping in 1976, and he asked for names of known minority firms from unofficial sources such as the Urban League and NAACP. *Id.* at p. 15 n. 10. Cooper calculated the dollar value of all of the contracts awarded in the five categories during the twenty-two year period and determined that identifiable minority firms received roughly 0.21 percent of that amount.

Cooper's calculations have some obvious limitations. First, they do not represent all prime construction contracts awarded by ODAS during the years in question; instead, they represent only those in the five categories he selected. Second, although his calculations covered a period of twenty-two years, official records on the identity of minority-owned firms were kept only during the last three years of the period he studied. The identity and number of minority-owned firms in the 1950s and 1960s was unknown. Some of Cooper's data was twenty years old when he compiled it, far too stale to support a finding of present discrimination.

There is no indication that Cooper ever attempted to determine the number of minority-owned construction firms that were ready, willing, and able to enter into prime construction contracts with the state, or what percentage they represented of the total number of such firms. Thus, the percentage of prime capital improvement contracts awarded to identifiable MBEs is meaningless. Without data on the availability of minority-owned firms, it is impossible to say whether they received more or less than their proportionate share of those contracts.

Finally, Cooper did not attempt to calculate the amount of state construction dollars which flowed to minority-owned subcontractors during the period studied.

2. The Legislative Budget Office Data

The statistical information compiled by the Legislative Budget Office ("LBO") resulted from a "small scale" investigation of minority participation in state construction which was done in 1977 at the request of Representative C.J. McLin. *Keip*, S.D. Ohio No. C–2–82–446, p. 16. The investigation was limited to a study of Department of Transportation prime construction contracts for the years 1975, 1976 and 1977. *Id.* These figures showed minority participation to be 0.13 percent, 0.3 per-

cent, and 0.18 percent for the three years respectively. *Id.* The data did not include any information on the number of MBE firms ready, willing, and able to perform road construction work for the state of Ohio, or what percentage they represented of the total number of such firms. It did not include any information on subcontracting.

3. Calculations based on 1972 census data reported in *Keip* and the Attorney General's Task Force on Minorities in Business

The report of the Attorney General's Task Force on Minorities in Business states:

> Statistics reveal that minority businesses received less than one-half of one percent (.5%) of all State purchase contracts from 1975 to 1977; yet seven percent (7%) of Ohio businesses are classified as minority.

Final Report, p. 17.

The report, at page 17 note 2, cites the LBO data as the source for the percentage of *all* state purchase contracts awarded to minority businesses, but the LBO study related only to construction contracts awarded by the Department of Transportation. *See Keip,* S.D. Ohio No. C–2–82–446, p. 16. Thus, the report misrepresents the data, transforming a calculation of the percentage of Department of Transportation construction contracts into the percentage of *all* state purchase contracts. The Supreme Court of Ohio accepted and relied upon this misstatement of the data. In fact, it does not appear that the state had any data on minority businesses' share of all state purchase contracts, data which was absolutely essential to any finding of disparity in the award of such contracts.

The report cites 1972 Census Bureau statistics as the source of the percentage of minority-owned business in Ohio. It is apparent that the state relied on the same information seventeen years ago in the trial of *Keip.*

These statistics [the ODAS and LIBO studies] were available to the General Assembly when it was considering Am. Sub. H.B. 584, as were U.S. Department of Commerce statistics indicating that minority businesses constituted approximately 6.7 percent of the total number of Ohio business enterprises.

*Keip,* S.D. Ohio No. C–2–82–446, p. 16. *See also* Final Report, P. 13.

In *Ritchey Produce,* the Supreme Court of Ohio relied on the 1972 census data which it gleaned from Judge Kinneary's decision in *Keip,* 85 Ohio St.3d at 258, 707 N.E.2d at 916 ("... minority businesses represented approximately 6.7 percent of the total number of Ohio businesses.") (citing *Keip,* S.D. Ohio No. C–2–82–446, op. 15–16), and from the report of the Attorney General's task force on minorities, 85 Ohio St.3d at 258, 707 N.E.2d at 917 ("... minority-owned businesses accounted for approximately seven percent of all Ohio businesses.") (citing Final Report).

▮ The 1972 census data, published by the U.S. Department of Commerce, includes a Bureau of the Census special report entitled "1972 Survey Of Minority–Owned Business Enterprises," as well as reports on all businesses, regardless of race or ethnicity, which are published for each state under the title "County Business Patterns 1972." These are public documents of which a court may take judicial notice. *See Mitchell v. Rose,* 570 F.2d 129, 132 n. 2 (6th Cir.1978), *cert. granted,* 439 U.S. 816, 99 S.Ct. 76, 58 L.Ed.2d 107 (1978), *rev'd on other grounds,* 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739 (1979). They are available at any public library. *See* Appendix A to this Opinion and Order.

The 1972 survey of minority-owned business enterprises indicates that in 1972 there were a total of 11,877 minority-owned businesses in Ohio. This is approximately the number reported in the report of the Attorney General's task force. *See,* Final Report, p. 13 (reporting 11,183 minority-owned businesses). This number includes all minority-owned firms, both those with employees and those without employees. Over eighty percent of these

firms (9,895 firms) did not have employees. The 1972 census data available for the total number of all business enterprises in Ohio was the total number of firms *with* employees: 165,732. The report of the Attorney General's task force rounds this number up to 166,000. Final Report, p. 13. It is apparent that the calculations of the percentage of minority-owned firms in Ohio which the Ohio Supreme Court relied upon in *Ritchey Produce* were based on these numbers (11,183 is 6.7 percent of 166,000; and 11,877 is 7 percent of 165,-732). It is also apparent that these calculations are a classic case of comparing apples to oranges. The total number of all minority-owned firms with and without employees was compared with the total number of all firms with employees. This calculation yields a number which is completely useless for determining whether minority-owned firms received a proportionate share of state purchasing contracts. Yet, these calculations were the ones relied upon by the Supreme Court of Ohio in upholding the Ohio MBE Act. This shows the folly of attempting to determine whether the state had a firm basis in evidence for a remedial program of race-based preferences in a case where the only "evidence" available was the arguments in the state's briefs.

▮ The statistical evidence the court relied upon was fatally flawed and formed no basis for a finding that minority-owned firms received less than their proportionate share of state contracts. The relevant universe of minority businesses is not all minority businesses in the state of Ohio, but only those willing and able to enter into contracts with the state of Ohio. In the case of a set-aside program in state construction, the relevant universe is minority-owned construction firms willing and able to enter into state construction contracts. Dr. Merelyn Bates–Mims, Deputy Director of the Department of Administrative Services, Equal Opportunity Division, testified in the October 1998 hearing before this court that the total universe of Ohio minority business enterprises would include:

carryout [sic] shops and beauty shops and the kinds of things, kinds of small businesses that you regularly find in minority communities which may not at all be interested or able to take advantage of the large volume kinds of contracts that are available in a state procurement.opportunity.

\*      \*      \*      \*      \*      \*

. . . and so there are many, many small very, very, very small, one-person show kind of operations in minority communities. I don't know what percentage make up that 22,000 of those kinds of businesses.

*Associated General Contractors of America v. Drabik,* Trial Transcript, pp. 144, 145. In her testimony, Dr. Bates–Mims was referring to 1990 census data on the number of minority businesses in Ohio. Justice O'Connor, speaking for the Court, said in *Croson:*

There is no doubt that "[w]here gross statistical disparities can be shown, they alone in a proper case may constitute prima facie proof of a pattern or practice of discrimination" under Title VII. But it is equally clear that "[w]hen special qualifications are required to fill particular jobs, comparison to the general population (rather than to the smaller group of individuals who possess the necessary qualifications) may have little probative value."

\*      \*      \*      \*      \*      \*

In this case, the city does not even know how many MBE's in the relevant market are qualified to undertake prime or subcontracting work in public construction projects.

*Croson,* 488 U.S. at 501, 502, 109 S.Ct. 706. Special qualifications were and are necessary to bid on prime construction contracts for the state of Ohio. As the 1978 report of the Ohio Attorney General's Task Force On Minorities In Business explained, those qualifications include adequate capital, credit, and the ability to obtain bonding. Here, as in *Croson,* the state did not know

how many MBEs in the relevant market were qualified to undertake prime or sub-contracting work in public construction projects.

Since at least the turn of the century, Ohio law has required that contracts for public works be awarded on the basis of competitive bidding. *See Carmichael v. McCourt*, 6 CC(NS) 561, 17 CD 775 (1905). Section 123.15 of the Ohio Revised Code provides that, except in cases of extreme public exigency or emergency, any contract for the performance of labor, furnishing of materials, or the construction of any structures or buildings in excess of $500 must be advertised in a newspaper of general circulation in or contiguous to the county where the contract is to be let, and where the work is to be performed, and that "[s]uch contracts shall be awarded to the lowest responsive and responsible bidder ..." If the state awards a contract to a firm that did not submit the lowest bid, it can be and often is sued by the lowest bidder. The courts of Ohio have not hesitated to grant appropriate relief where the disappointed bidder can show that it was the lowest responsive and responsible bidder. Thus, any MBE who was the lowest responsive and responsible bidder on a state construction contract could seek immediate relief in an Ohio court.

■ It is also the policy of the state to require competitive bidding in the award of contracts for the purchase of non-construction goods and services. Although the policy varies somewhat from agency to agency, in general it is the rule that purchases between $300 and $2,000 are informally bid competitively by such means as seeking telephone bids from three registered vendors, or mailing bids to a selected number of registered vendors with formal competitive bidding for purchases in excess of $2,000, wherein bid requests are mailed to all vendors registered for the products or services. *See* Final Report, p. 18.

Since state contracts are awarded on the basis of competitive bidding, overt discrimination in the award of contracts by state officials should be relatively easy to detect and remedy. There is little or no opportunity for the kind of subjective decision making which can mask intentional discrimination. Indeed, ironically, one of the suggestions made in the October 1978 Final Report of the Ohio Attorney General's Task Force On Minorities In Business was to increase the opportunity for subjective decision making in the award of state contracts so that state contracting officials would have the discretion to award more contracts to minority firms. *See* Final Report, p. 17. This is not to say that such a system is impervious to manipulation, but it does suggest that proof that the state itself is discriminating in the award of such contracts would require some evidence that competitive bidding requirements were being ignored or circumvented. No such evidence was offered in the instant case and no such evidence was mentioned in *Ritchey Produce*.

In the foregoing discussion, this court has examined all of the information which the Supreme Court of Ohio relied upon to uphold Ohio's set-aside program in state purchasing. In *Ritchey Produce*, the Supreme Court of Ohio referred to this evidence variously as "a wealth of evidence," 85 Ohio St.3d at 262, 707 N.E.2d at 919, and "a vast array of statistical evidence," 85 Ohio St.3d at 261, 707 N.E.2d at 919, and concluded that the General Assembly had a " 'strong basis' in evidence to support its conclusion that Ohio's program was necessary to redress a pattern of discriminatory exclusion of minorities from state contracting opportunities ...," 85 Ohio St.3d at 254, 707 N.E.2d at 914. This court respectfully disagrees. In 1980, when the Ohio General Assembly adopted its minority set-aside program, the evidence that minority firms had received less than their fair share of state contracts because of a pattern of racial discrimination in which the state was an active or passive participant was, in the judgment of this court, non-existent. This court does not believe that, by any stretch of the imagination, it can be said that this evi-

dence satisfies the requirement which the Supreme Court of the United States established in *Wygant,* 476 U.S. at 277, 106 S.Ct. 1842, and reiterated in *Croson,* 488 U.S. at 500, 109 S.Ct. 706, that race-based remedies must be supported by a "strong basis in evidence for [the] conclusion that remedial action was necessary."

■■■■ In order to support a compelling state interest for race-based preferences, the evidence of past discrimination must be reasonably current. Where evidence is "too remote to support a compelling governmental interest to justify the affirmative action plan," it must be struck down. *Brunet,* 1 F.3d at 409. In *Brunet,* the court found that fourteen-year-old evidence of discrimination was too remote. *Id.* at 409. In *Hammon v. Barry,* 826 F.2d 73, 76–77 (D.C.Cir.1987), the Court of Appeals for the District of Columbia Circuit found that discriminatory conduct occurring eighteen years prior to the institution of an affirmative action plan was insufficient to justify the plan. In *Detroit Police Officers Association v. Young,* 989 F.2d 225, 228 (6th Cir.1993), the Court of Appeals for the Sixth Circuit terminated a nineteen-year-old affirmative action plan because "[i]t no longer serves the same compelling state interests as it once did under the changed circumstances of almost two decades."

In *Ritchey Produce,* the Supreme Court of Ohio found that Ohio had a compelling interest for granting race-based preferences in state contracting, relying on twenty-year-old historical information it took from the state's briefs. Ohio's high court seems to have been entirely oblivious to the age of the "evidence" it relied on. Information which is over two decades old can not form the basis for a compelling state interest to redress past discrimination.

## V.

■■■■ The second branch of the strict scrutiny analysis is whether the program at issue is "narrowly tailored." In *United States v. Paradise,* 480 U.S. 149, 171, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (citing *Local 28 Sheet Metal Workers' Int'l Ass'n v. Equal Employment Opportunity Comm'n,* 478 U.S. 421, 481, 106 S.Ct. 3019, 92 L.Ed.2d 344 (1986)), the Court identified four factors to be considered in determining whether race-conscious remedies are appropriate: "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief ...; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties."

a) Consideration of race-neutral alternatives

In *Croson,* the Court held that the Richmond plan failed the "narrowly tailored" test because the city did not give any consideration to the use of race-neutral means to increase minority business participation in city contracting. *Croson,* 488 U.S. at 507, 109 S.Ct. 706. The Court noted that:

> Many of the barriers to minority participation in the construction industry relied upon by the city to justify a racial classification appear to be race neutral. If MBE's disproportionately lack capital or cannot meet bonding requirements, a race-neutral program of city financing for small firms would, *a fortiori,* lead to greater minority participation.

*Id.*

In *Ritchey Produce,* the Supreme Court of Ohio found that: "Ohio's MBE program was enacted only after a host of earlier efforts designed to increase minority participation in state contracting opportunities had failed to eliminate the effects of racial discrimination in the area of state contracting." 85 Ohio St.3d at 267, 707 N.E.2d at 923. In so finding, the court referred to Part IV of its opinion, wherein it enumerated the historical information concerning the evidence of discrimination possessed by the Ohio General Assembly when it enacted the 1980 MBE Act, and which this court has examined and de-

scribed in detail. Far from finding a "host of earlier efforts to increase minority participation in state contracting opportunities" this court found in the materials cited by the Ohio Supreme Court only one, to wit: the provisions of the biennial appropriation bill challenged in *Ohio Chapter, AGC,* a limited race-conscious program which lasted only two years.

This court has been unable to find any evidence in the historical record that the Ohio General Assembly gave any consideration to the use of race-neutral means to increase minority participation in state contracting before resorting to race-based quotas. The Supreme Court of Ohio referred to the failure of various methods, such as goals set by executive orders and administrative regulations. *Id.* at 267–68, 707 N.E.2d at 923. The only executive order referred to in Part IV of the Ohio Supreme Court's *Ritchey Produce* opinion is the January 27, 1972 executive order by former Ohio governor, John J. Gilligan. This executive order does not create any specific programs to assist minority contractors, nor does it impose specific requirements on any state agency. It is essentially an hortatory order which encourages all state departments, agencies, commissions, and employees under the governor's jurisdiction to "rigorously take affirmative action to insure equality of opportunity in the internal affairs of state government, as well as their relations with the public, including those persons and organizations doing business with the State." Executive Order of January 27, 1972, filed herein as State's Exh. A, p. 4. The only substantive aspects of the order relate to the adoption of rules and regulations on equal employment opportunity in state and state-assisted construction projects, and the creation by the Director of the Department of Public Works of a new division for equal employment opportunity within that department. The focus of the order is on employment, not on the award of contracts. The order contains no numerical or other tangible goals of any kind.

The Final Report of the Ohio Attorney General's Task Force On Minorities In Business, issued in October 1978, identified a number of specific obstacles to small and minority-owned businesses seeking state contracts. They included lack of information about state contracting opportunities; lack of bonding capacity; lack of capital and financing; as well as lack of basic management, marketing, and accounting skills. The task force concluded that previous state projects to assist minority businesses "are ineffective, fragmented and limited in scope." Final Report, p. 27. The Attorney General recommended various programs to remove these impediments, including the establishment of a state alternative bonding program of last resort; the improvement of the system of disseminating information regarding the availability of state contracts; the creation of a department of minority business development to provide a variety of services, including management and technical assistance, procurement and bid packaging assistance, bonding underwriting and bonding technical assistance, and direct loan and loan guarantee financing. All of these recommendations could have been implemented on a race-neutral basis before resorting to race-conscious relief. There is no indication that the Ohio General Assembly ever considered doing so. When the General Assembly did adopt programs providing lending and bonding assistance, they were part of the same race-conscious program which contains the set-aside quotas here under attack and they were limited to the members of the four specified racial minorities. The failure to consider race-neutral means was fatal to the set-aside program in *Croson,* and the failure of the state of Ohio to consider race-neutral means before adopting the MBE Act of 1980 likewise dooms Ohio's program of race-based quotas.

b) Flexibility

The Ohio Supreme Court held in *Ritchey Produce* that Ohio's MBE program satisfied the "flexibility" prong of the "narrowly tailored" analysis, because all set-aside requirements are to be met "approxi-

mately" and because the waiver provisions of the program have been applied in a flexible manner. *See Ritchey Produce,* 85 Ohio St.3d at 268, 707 N.E.2d at 924. The evidence presented in the instant case, however, shows that there is no justification for concluding that the word "approximately" in the set-aside statute results in flexibility. Indeed, to the contrary, the evidence in the instant case revealed that in the case of construction, the state has used the word "approximately" to justify exceeding the set-aside goals, but never for reducing or eliminating them. So, instead of allowing flexibility to ameliorate harmful effects of the program, the imprecision of the statutory goals has been used to justify bureaucratic decisions which increase its impact on non-minority businesses.

In July 1995, an MBE improvement team, consisting of employees from eight cabinet agencies and the governor's office, evaluated the success of the Ohio MBE program and reported that "the state has met and exceeded the construction goals for many years." State Sponsored Equal Opportunity Programs in Ohio, March 28, 1996, Appendix I, Final Report of the MBE Improvement Team, July 1995, filed herein as Plaintiff's Exh. 1, p. A–10. During the ten-year period from fiscal year 1988 through fiscal year 1997, the percentage of the dollar value of prime construction contracts set aside for exclusive bidding by minority firms ranged from a low of 7.0 percent to a high of 9.40 percent. *See* Plaintiff's Exhs. 2 through 10.

The number and dollar amounts of contracts to be set aside for exclusive bidding by minority contractors is determined separately by each of the agencies or departments of state government, and by each of the state colleges and universities. Some of these agencies have often far exceeded the five percent quota mandated by the MBE statute. For example, in fiscal year 1996–97, 20.0 percent of the forty-five million dollars budgeted for prime construction contracts by the Department of Public Safety was set aside for bidding by minority firms only. And, in the same year, 12.2 percent of the seventy million dollar budget of the Department of Rehabilitation and Correction was set aside for minority bidders only. *See* Plaintiff's Exh. 10, p. 10. All of these percentages relate to contracts set aside for bidding which are restricted to minority-owned firms. They do not include the additional contracts which minority-owned firms are awarded in free competition in the open market. The evidence in the instant case showed that, as one would expect, minority firms do compete for these contracts and are often successful, but the state does not keep records on the dollar value of the contracts minority firms obtain through free competition. The set-aside goals are not adjusted for the dollar amount of contracts awarded on the open market.

In *Croson,* the Supreme Court held that the Richmond plan was not "narrowly tailored" observing that:

> Since the city must already consider bids and waivers on a case by case basis, it is difficult to see the need for a rigid numerical quota....

*Croson,* 488 U.S. at 508, 109 S.Ct. 706. Justice O'Connor, writing for the Court, noted that the congressional scheme upheld in *Fullilove v. Klutznick,* 448 U.S. 448, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980), allowed for a waiver of the set-aside provision where an MBE's higher price was not attributable to the effects of past discrimination. *Id.* She went on to note that, unlike the program upheld in *Fullilove:*

> [t]he Richmond Plan's waiver system focuses solely on the availability of MBE's; there is no inquiry into whether or not the particular MBE seeking a racial preference has suffered from the effects of past discrimination by the city or prime contractors.
>
> Given the existence of an individualized procedure, the city's only interest in maintaining a quota system rather than investigating the need for remedial action in particular cases would seem to be simple administrative convenience. But

the interest in avoiding the bureaucratic effort necessary to tailor remedial relief to those who truly have suffered the effects of prior discrimination cannot justify a rigid line drawn on the basis of a suspect classification.

*Id.* The same defects exist in the Ohio plan. The waiver system for prime contracts focuses solely on the availability of MBEs. The awarding agency may remove the contract from the set-aside program and open it for bidding by non-minority contractors if no certified MBE submits a bid, or if all bids submitted by MBEs are considered unacceptably high. But in either event, the agency is then required to set aside additional contracts to satisfy the numerical quota required by the statute. With respect to subcontracting, the Ohio plan allows for administrative modification or waiver only if the prime contractor is unable to locate qualified MBEs after making a good faith effort. In neither instance is any consideration given to whether the particular MBE seeking a racial preference has suffered from the effects of past discrimination by the state or prime contractors.

c) Duration of the relief

One critical prong of the "narrowly tailored" test is limited duration. Such a program must be "appropriately limited such that it 'will not last longer than the discriminatory effects it is designed to eliminate.'" *Adarand,* 515 U.S. at 238, 115 S.Ct. 2097 (quoting *Fullilove,* 448 U.S. at 513, 100 S.Ct. 2758 (Powell, J., concurring)). In *Detroit Police Officers Association,* 989 F.2d at 228, the Sixth Circuit Court of Appeals stated that:

> [l]imiting the duration of a race-conscious remedy which clearly impacts adversely upon the plaintiffs is a keystone of a narrowly tailored plan as may be seen by recent Supreme Court decisions.

*See also Middleton v. City of Flint, Michigan,* 92 F.3d 396, 413 (6th Cir.1996), *cert. denied,* 520 U.S. 1196, 117 S.Ct. 1552, 137 L.Ed.2d 700 (1997) (remedial plan for pro-

motion of police sergeants which lasted nine years was not "narrowly tailored").

In *Ritchey Produce,* the Ohio Supreme Court responded to the duration element of the "narrow tailoring" requirement of strict scrutiny, and found that element satisfied because "the program is now and has always been subject to continuing reassessment and review by the General Assembly." *Ritchey Produce,* 85 Ohio St.3d at 269, 707 N.E.2d at 925. This, quite obviously, begs the question. The 1980 MBE Act is unlimited in duration. When the Act was passed, an attempt to include a three-year sunset provision by amendment was defeated. *See Keip,* S.D.Ohio No. C-2-82-446, p. 9. While it is true that the Ohio General Assembly has revisited the provisions of Ohio's MBE Act on six separate occasions since 1980, those revisitings have been limited to minor adjustments. *Ritchey Produce,* 85 Ohio St.3d at 269-70, 707 N.E.2d at 925. There is no evidence that, at any time during the nearly two decades the Act has been in effect, the General Assembly has ever reconsidered whether a compelling state interest exists which would justify the continuation of a race-based remedy. One of the exhibits in the instant case was the affidavit of Lynn R. Wachtman, a member of the Ohio House of Representatives who has served continuously since 1985. Mr. Wachtman's affidavit states:

> 5. During my tenure in the General Assembly legislation which sought to substantially modify or repeal race based set asides has been introduced. On no occasion did any such legislation advance for serious consideration of passage. It is my opinion that it would be politically impossible for any legislation substantially altering or repealing R.C. § 123.151 to be passed in the General Assembly of Ohio. There are significant interest groups represented in the legislative process that have the ability and political influence to effectively block such legislation.

Wachtman Aff. ¶ 5, Plaintiff's Exh. 27.

In retrospect, Judge Engle's dissenting opinion in *Keip* seems almost prophetic:

... Ohio's Minority Business Enterprise Act is fatally flawed by its failure to incorporate any durational limitations upon its operation. In its present form, this act presents a very real danger of fostering a dependency upon favoritism which is inimical to general principles of equality and, I believe, to the commands of the Equal Protection Clause.

*Keip,* 713 F.2d at 176.

If an originally permissible race-conscious remedy continues to operate after fulfilling its objective of redressing past discrimination, it becomes an impermissible racial preference.

The Ohio MBE Act contains absolutely no durational limitation and thus threatens to outlive its legitimate purpose.

\*　　\*　　\*　　\*　　\*　　\*

I do not view this requirement as an incidental concern. I am unable to agree with the majority that the absence of any durational limits may be safely overlooked because it is "incredible" that a popularly elected legislature would suffer the continuance of such a law beyond the period of constitutional need. On the contrary, I find it entirely credible that such a law may remain in force well beyond the elimination of discriminatory effects. It is precisely this danger which has occasioned such emphasis in the courts upon some distinct termination or "sunset" provision.

*Id.* at 176, 177. The Ohio MBE Act of 1980 fails the "narrowly tailored" test because it is unlimited in duration.

d) The Relationship of the goals to the relevant market

■ In *Ritchey Produce* the Supreme Court of Ohio found that the numerical goals of the Ohio MBE Act "have a direct relationship to Ohio's contracting market[,]" 85 Ohio St.3d at 268, 707 N.E.2d at 924, citing its earlier discussion of the statistical evidence which purportedly showed that "minority-owned businesses accounted for approximately seven percent of all Ohio businesses," 85 Ohio St.3d at 258, 707 N.E.2d at 917. Assuming it was true that MBEs constituted approximately seven percent of all Ohio businesses (which it was not), the court does not explain how this would justify setting aside over twice that amount, or fifteen percent, of the state's business for minority firms. A goal which exceeds the percentage of available minority firms by over 100 percent bears no relationship to the relevant market, and fails this element of the "narrowly tailored" requirement of strict scrutiny.

But, in reality, the situation in Ohio is worse because it is likely that minority firms ready, willing, and able to perform state purchasing contracts are much less than seven percent of all of such firms in Ohio. As discussed above, the census data relied on by the state and accepted by the Supreme Court of Ohio arrived at the seven percent figure by comparing the number of minority firms with and without employees to all firms with employees. If one were to use the census data for an "apples to apples" comparison of all MBE firms with employees (1,984) to all firms with employees (165,732), it would show that minority firms represent only 1.2 percent of all Ohio firms. Using this estimate of availability, it is apparent that the fifteen percent set-aside quota would be well over ten times what it should be.

Setting excessive and unreasonable goals which have no relation to the availability of minority-owned firms inevitably results in the sort of reverse discrimination against non-minority firms described in the following subsection of this opinion.

The state presented no evidence of the availability of minority-owned construction firms which are qualified to enter into prime construction contracts with the state of Ohio, nor any evidence of the availability of minority-owned firms which are qualified to perform subcontract work on state construction projects. There is no evidence that the prime contract goal of five percent or the subcontracting goal of seven percent have any relationship to the relevant market.

The goals of the Ohio MBE Act are not related to the relevant market and the Act fails this element of the "narrowly tailored" requirement of strict scrutiny.

e) Impact on the rights of non-minorities

The Ohio Supreme Court ended its analysis of whether the Ohio MBE Act was "narrowly tailored" by concluding that "the burdens imposed on non-MBEs by virtue of the set-aside requirements are relatively light." *Ritchey Produce*, 85 Ohio St.3d at 270, 707 N.E.2d at 925. The evidence presented here and elsewhere indicates otherwise.

The potential for arbitrary selection and the "bunching" of set-aside selections resulting in the exclusion of non-minority contractors from the opportunity to bid on a substantial portion of a large state agency's purchase contracts was one of the potential dangers of Ohio's set-aside scheme which Judge Kinneary noted in his decision in *Keip* nearly seventeen years ago:

In determining which contracts will be set aside for minority bidding only, each state agency acts autonomously and exercises complete discretion. Individual agencies' practices in this regard can and do lead to essentially arbitrary selections. The factor of arbitrariness aside, however, some agencies have found it difficult or impossible to avoid "bunching" or concentrating their set-aside selections into a few particular areas for which there are minority businesses available to bid. Particularly with respect to procurement contracts, the vast majority of which are let by the Department of Administrative Services, there are frequently no certified minority vendors willing or able to bid on certain types of goods. In order to achieve its 15 percent quota under the Act, the Department is forced to set aside disproportionately large contracts for goods that minority vendors can deliver. In fiscal year 1982, the Department decided to set aside 100 percent of its contracts to purchase coal for the State of Ohio, and thus, non-minority coal producers were entirely denied the opportunity to sell any coal to the State.

*Keip*, S.D.Ohio No. C–2–82–446, pp. 17, 18. The evidence in the instant case revealed that the practices criticized by Judge Kinneary have continued for almost two decades. For a period of time, the Department of Rehabilitation and Corrections was satisfying its set-aside obligations by reserving all or nearly all of its plumbing contracts for minority bidders. Other state departments and agencies were engaging in similar practices. *See* Plaintiff's Exh. 14. As a result, non-minority contractors in various trades were effectively excluded from the opportunity to bid on any work for large state agencies, departments, and institutions solely because of their race.

In 1994, a non-minority painting contractor which had enjoyed success in obtaining painting contracts with The Ohio State University filed suit in this court alleging that its revenues from painting contracts with the University had markedly declined, and that it had received none at all after 1991, as a result of the University's decision to set aside all of its painting contracts for minority bidders only. *See Henry Painting Co. v. The Ohio State University*, Case No. C–2–94–0196 (S.D.Ohio). In its complaint, Henry Painting challenged the constitutionality of the Ohio MBE Act facially and as applied. Depositions and exhibits filed in *Henry Painting* revealed that, in the early 1980s, The Ohio State University had difficulty satisfying its fifteen percent minority set-aside requirement for the purchase of goods and services and, rather than attempting to raise minority participation in each category of goods and services, it began establishing 100 percent set asides for certain goods and services, including painting, carpeting, electrical work and supplies, janitorial services and supplies, office supplies, stock form paper, and painting services. Thus, Henry Painting Company was effectively excluded from

bidding on painting contracts for The Ohio State University because of the race of its owner. Over time, the list of trades, services, and commodities which the University barred non-minorities from bidding on grew to thirty-seven.

While Henry Painting Company's motion for summary judgment was pending, the University settled the case by paying $300,000 and entering into a consent decree in which it agreed to discontinue its practice of setting aside 100 percent of all painting contracts for minority bidders. This settlement avoided a decision on the constitutionality of the 1980 MBE Act and it preserved the University's policy of setting aside 100 percent of other categories of goods and services for bidding by minorities only.

The evidence in *Henry Painting* showed that the University encouraged its various departments to exceed the fifteen percent set-aside requirement for goods and services. It issued a vendor's information booklet to purchasing agents, which stated, *inter alia:*

> The University's goal is to exceed the 15% state requirement ... It is important that each department contribute according to their potential and not stop once the 15% figure is reached.

*Henry Painting*, Plaintiff's Motion for Summary Judgment, Exh. E.

In the instant case, Dr. Merelyn Bates–Mims, Deputy Director of ODAS, Equal Opportunity Division, testified that there is no limit to the percentage of the dollar value of the purchasing contracts that any state agency department or institution may set aside for minority bidding, and there are no provisions for monitoring the set-asides to determine whether they conform in any way to the percentage of qualified MBEs in the relevant market. The University apparently has little concern about the impact these policies may have on non-minority vendors. Pamela S. Clark, manager of the University's Minority Business Development Program, gave the following deposition testimony:

Mr. Carvin:

Q. Is there anybody at Ohio State University who has evaluated the effectiveness or fairness of the affirmative action program, so far as you know?

Ms. Clark:

A. Not that I am aware of.

Mr. Carvin:

Q. Does that trouble you at all?

Ms. Clark:

A. No, Mr. Carvin, it doesn't.

*Henry Painting*, Plaintiff's Motion for Summary Judgment, Exh. E.

The evidence in *Henry Painting* revealed that between the years 1992 and 1995, the University far exceeded its five percent set-aside requirement for construction services by awarding over twenty percent of its construction budget to minority firms: twenty-eight percent in 1992; twenty percent in 1994; and twenty-seven percent in 1995. *Henry Painting*, Plaintiff's Motion For Summary Judgment, Exh. N.

Since the early 1980s, The Ohio State University has been saying to many different kinds of trades and businesses: "Whites and other non-minorities need not apply." The evidence strongly suggests that other large state agencies and institutions have likewise completely excluded non-minorities in various trades and businesses from the opportunity to sell their goods to them.

The plaintiff in *Ritchey Produce* may be yet another example of this kind of arbitrary concentration of set-aside selections. It appears that this small produce company in Zanesville, Ohio was able to obtain a two million dollar contract to supply fresh fruits and vegetables to state institutions as a result of being certified as a minority business enterprise by the ODAS. This, no doubt, represents a substantial part, perhaps even 100 percent, of the state's requirements. Mr. Ritchey is no longer able to bid on that two million dollar contract because of his race. Indeed, like Henry Painting Company, he may now be com-

pletely precluded from selling his product to the state of Ohio. Ironically, he could have kept that contract if he had been born in India instead of Lebanon. *See DLZ Corp. v. Ohio Dept. of Admin. Servs.,* 102 Ohio App.3d 777, 658 N.E.2d 28 (1995) (finding that Asian–Indians are "Orientals" within the meaning of the Ohio set-aside statute). The absurd and arbitrary nature of such a scheme of racial classifications was well-stated by Judge Hogan, the trial judge in *Ritchey Produce:*

Working our way north and west from India we first come to Pakistan, then Iran, then Iraq, then Syria, and finally Lebanon. If Asian Indians are "Oriental", shall we exclude Pakistanis separated from India only by the Great Indian Desert? And if Pakistanis are "Oriental", shall we exclude Iranians who share a common border with Pakistan? And if Iran is "Oriental", shall we exclude Iraq separated from Iran only by the Zagros Mountains? And if Iraq is "Oriental", shall we exclude Syria for the Euphrates River flows through both countries? And finally if Syria is "Oriental", how can its contiguous neighbor Lebanon be anything but "Oriental"?

This Court can think of few things more repugnant to our constitutional system of government than the construction of a statute that would exclude a group of United States' [sic] citizens and residents of Ohio from a State program, the sole criteria for exclusion being the side of a river, a mountain range, or a desert their ancestor decided to settle.

The evidence in the instant case revealed that, in 1995, eighty percent of the dollar value of all set-aside contracts went to only five percent of the certified MBE contractors. Report to the Governor, State Sponsored Equal Opportunity Programs In Ohio, filed herein as Plaintiff's Exh. 12, p. 3. These firms include highly successful MBE firms such as the intervenor herein, the Sherman R. Smoot Corp., which is listed among the top four hundred contractors in the nation with revenues of $110.7 million in 1997. Plaintiff's Exh. 15.

In light of the concerns expressed by Judge Kinneary in his 1982 decision in *Keip,* the evidence presented in *Henry Painting,* and the evidence in the instant case, it appears that Ohio's MBE Act which was created ostensibly to remedy past discrimination against minority-owned firms in the sale of goods and services to the state of Ohio has become a tool for reverse discrimination against non-minority firms.

f) Random inclusion of minority groups

The Ohio MBE Act provides race-based benefits to four specific minority groups: blacks, American Indians, Hispanics and Orientals. R.C. 122.71(A)(1).

In *Ritchey Produce,* the Ohio Supreme Court acknowledged that "the United States Supreme Court specifically warned against the 'random inclusion' of minority groups in an MBE set-aside plan." *Ritchey Produce,* 85 Ohio St.3d at 266, 707 N.E.2d at 922. It went on to say that "[t]he information that was considered by the General Assembly at the time Ohio's MBE program was first adopted in 1980 included information concerning the four specific minority groups specified in the [MBE statute]." *Id.* at 265, 707 N.E.2d at 922. However, the only information the court cited in support of this statement was one sentence in Judge Tyack's 1979 decision in *Ohio Building Chapter, AGC* discussed *supra.* There is not the slightest hint in the briefs filed in that case that the parties had any information about the number of black, Hispanic, Oriental or American Indian-owned construction firms, or the respective shares of the total capital improvement expenditures they received. None of the statistical information discussed in Part IV of the *Ritchey Produce* opinion breaks down the percentage of all firms that were owned by specific minority groups or the dollar amounts of contracts received by firms in specific minority groups. There is no indication that this kind of information was included in

the statistical data which the Ohio General Assembly possessed in 1980.

In *Croson,* the Supreme Court noted that "[i]t may well be that Richmond has never had an Aleut or Eskimo citizen." *Croson,* 488 U.S. at 506, 109 S.Ct. 706. Similarly, it may well be that in 1980, no American Indian-owned construction firm had ever sought to perform a prime construction contract for the state of Ohio. The apparent random inclusion of racial groups that, as a practical matter, may never have suffered from discrimination in the construction industry in Ohio "strongly impugns the [state's] claim of remedial motivation." *Croson,* 488 U.S. at 506, 109 S.Ct. 706.

## VI.

■ The Ohio Supreme Court concluded its *Ritchey Produce* opinion with the statement that "Ohio's MBE program should be upheld unless it is clearly unconstitutional beyond a reasonable doubt." *Ritchey Produce,* 85 Ohio St.3d at 274, 707 N.E.2d at 928. The proposition that a program of race-based benefits should be upheld unless it is "clearly unconstitutional beyond a reasonable doubt" appears to be a novel one in equal protection jurisprudence. Ohio's high court cites no precedent to support this proposition of law, and it is difficult to reconcile it with pronouncements contained in various opinions of the Supreme Court of the United States which have become settled law:

> Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination.

*Regents of the Univ. of California v. Bakke,* 438 U.S. 265, 291, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Powell, J., joined by White, J.).

> Any preference based on racial or ethnic criteria must necessarily receive a most searching examination to make sure that it does not conflict with constitutional guarantees.

*Fullilove,* 448 U.S. at 491, 100 S.Ct. 2758.

> The history of racial classifications in this country suggests that blind judicial deference to legislative or executive pronouncements of necessity has no place in equal protection analysis.

*Croson,* 488 U.S. at 501, 109 S.Ct. 706.

> "[A]ny person, of whatever race, has the right to demand that any governmental actor subject to the Constitution justify any racial classification subjecting that person to unequal treatment under the strictest judicial scrutiny."

*Adarand,* 515 U.S. at 224, 115 S.Ct. 2097.

## *CONCLUSION*

■ In determining whether to grant a stay pending appeal, the court should consider the same four factors that are traditionally considered in evaluating the granting of a preliminary injunction. *Michigan Coalition of Radioactive Material Users, Inc. v. Griepentrog,* 945 F.2d 150, 153 (6th Cir.1991) *rev'd on other grounds,* 954 F.2d 1174 (6th Cir.1992) (citing *Frisch's Restaurant, Inc. v. Shoney's Inc.,* 759 F.2d 1261, 1263 (6th Cir.1985); *In re DeLorean Motor Co.,* 755 F.2d 1223, 1228 (6th Cir.1985)). These well known factors are: "1) the likelihood that the party seeking the stay will prevail on the merits of the appeal; 2) the likelihood that the moving party will be irreparably harmed absent a stay; 3) the prospect that others will be harmed if the court grants the stay; and 4) the public interest in granting the stay." *Griepentrog,* 945 F.2d at 153.

■ This court believes that it is very unlikely that the state will prevail on the merits of its appeal. The state will not sustain any irreparable injury if a stay is not granted. If the court grants the stay, there is a great likelihood that others will be harmed, specifically non-minority businesses which seek to do business with the state will be harmed by being excluded from the opportunity to bid on state contracts solely because of their race. These same non-minority businesses have suffered from the effects of an illegal and unreasonable program of race-based quotas for nearly twenty years, and this court believes that it would be intolerable to permit that harm to continue for one more

day. The public interest in this case is represented by the principles embodied in the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. In this case, the public interest would not be served but instead violated if the court were to grant the requested stay.

The motion for stay pending appeal is denied.

It is so ORDERED.

CBP-72-37 **OHIO**

# County Business Patterns 1972

## Employment and Taxable Payrolls
### Number and Employment-Size of Reporting Units

### by Industry Groups

## CONTENTS

| | Page |
|---|---|
| Column Headings of the Tables | ii |
| General Explanation | 1 |
| Introduction | 1 |
| Types of Employment Covered | 1 |
| Definitions of Basic Data Items | 2 |
| Industry and County Classifications | 3 |
| Sources of Data | 4 |
| Data Withheld From Publication | 5 |
| Comparability With Other Data | 5 |
| State Map | 9 |
| Chart—Percent Distribution of Payrolls and Employment by Industry Division: 1972 | 10 |

Tables:
| | | Page |
|---|---|---|
| 1A. | The State: 1972 and 1971 | 11 |
| 1B. | The State, by Industry: 1972 | 12 |
| 1C. | The State; Employees, by Employment-Size Class: 1972 | 24 |
| 1D. | The State; Administrative and Auxiliary Units: 1972 | 25 |
| 1E. | The State; Reporting Units With 500 Employees or More, by Employment-Size Class: 1972 | 26 |
| 1F. | The State; by County: 1972 and 1971 | 27 |
| 2. | Counties: 1972 | 29 |
| 3. | Standard Metropolitan Statistical Areas: 1972 | 187 |
| | Appendix A—Federal Civilian Employment and First Quarter Payroll, by County: 1972 | 198 |

COUNTY BUSINESS PATTERNS

# TABLE 1B. The State, by Industry: 1972

(Excludes government employees, railroad employees, self-employed persons, etc.—see "General Explanation." Size class 1 to 3 includes reporting units having payroll during 1st quarter but no employees during said period. "0" denotes figure withheld to avoid disclosure of operations of individual reporting units.)

| SIC code | Industry | Number of employees, mid-March pay period | Taxable payrolls, Jan.-Mar. ($1,000) | Total reporting units | Number of reporting units, by employment-size class | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 1 to 3 | 4 to 7 | 8 to 19 | 20 to 49 | 50 to 99 | 100 to 249 | 250 to 499 |
| | OHIO | | | | | | | | | | |
| | TOTAL . . . . . . . . . . . . . . . | 3 195 197 | 6 333 878 | 165 732 | 76 783 | 35 787 | 29 685 | 14 479 | 4 574 | 2 766 | 905 |
| ... | AGRICULTURAL SERVICES, FORESTRY, FISHERIES. | 6 274 | 7 717 | 1 179 | 719 | 257 | 155 | 39 | 7 | 1 | |
| 07 | AGRICULTURE SERVICES AND HUNTING. . . . | 6 141 | 7 578 | 1 151 | 702 | 252 | 151 | 37 | 7 | 1 | 1 |
| 071 | MISC. AGRICULTURAL SERVICES . . . . . | 554 | 632 | 67 | 34 | 18 | 8 | 4 | 3 | | |
| 072 | ANIMAL HUSBANDRY SERVICES . . . . . . | 2 738 | 3 029 | 623 | 398 | 136 | 77 | 9 | 3 | | - |
| 073 | HORTICULTURAL SERVICES. . . . . . . . | 2 834 | 3 880 | 455 | 266 | 96 | 66 | 24 | 1 | 1 | 1 |
| 08 | FORESTRY. . . . . . . . . . . . . . | 30 | 30 | 10 | 7 | 2 | 1 | - | - | | |
| 09 | FISHERIES . . . . . . . . . . . . . | 103 | 108 | 17 | 9 | 3 | 3 | 2 | - | - | |
| ... | MINING. . . . . . . . . . . . . . . | 22 722 | 55 711 | 911 | 308 | 181 | 235 | 114 | 35 | 23 | 8 |
| 12 | BITUMINOUS COAL AND LIGNITE MINING. . . | 11 381 | 29 485 | 184 | 40 | 29 | 43 | 37 | 13 | 10 | 7 |
| 1211 | BITUMINOUS COAL . . . . . . . . . . | 11 381 | 29 485 | 184 | 40 | 29 | 43 | 37 | 13 | 10 | 7 |
| 13 | OIL AND GAS EXTRACTION. . . . . . . . | 2 657 | 4 782 | 356 | 186 | 66 | 72 | 26 | 6 | - | |
| 131 | CRUDE PETROLEUM AND NATURAL GAS . . . | 888 | 1 592 | 183 | 126 | 25 | 24 | 6 | 2 | - | |
| 138 | OIL AND GAS FIELD SERVICES. . . . . | 1 769 | 3 190 | 173 | 60 | 41 | 48 | 20 | 4 | - | |
| 1381 | DRILLING OIL AND GAS WELLS. . . . . | 999 | 1 612 | 90 | 22 | 25 | 29 | 12 | 2 | - | |
| 1382 | OIL AND GAS EXPLORATION SERVICES. . | 129 | 303 | 14 | 4 | 3 | 6 | 1 | - | - | |
| 1389 | OIL AND GAS FIELD SERVICES, N.E.C.. | 635 | 1 273 | 68 | 34 | 12 | 13 | 7 | 2 | - | |
| 14 | NONMETALLIC MINERALS, EXCEPT FUELS. . | 5 668 | 12 306 | 330 | 76 | 72 | 111 | 50 | 12 | 8 | 1 |
| 142 | CRUSHED AND BROKEN STONE. . . . . . . | 2 344 | 5 235 | 98 | 12 | 10 | 37 | 29 | 6 | 4 | |
| 1422 | CRUSHED AND BROKEN LIMESTONE. . . . | 2 140 | 4 798 | 84 | 7 | 8 | 34 | 25 | 6 | 4 | |
| 144 | SAND AND GRAVEL . . . . . . . . . . | 2 431 | 5 011 | 197 | 54 | 53 | 64 | 18 | 5 | 3 | |
| 1442 | CONSTRUCTION SAND AND GRAVEL. . . . | 2 087 | 4 226 | 168 | 46 | 45 | 56 | 14 | 4 | 3 | |
| 1446 | INDUSTRIAL SAND . . . . . . . . . . | 125 | 324 | 5 | 1 | 1 | 1 | 1 | 1 | - | |
| 145 | CLAY AND RELATED MINERALS . . . . . . | 264 | 531 | 18 | 6 | 3 | 5 | 3 | 1 | - | |
| 1453 | FIRE CLAY . . . . . . . . . . . . | 158 | 319 | 8 | 2 | 1 | 5 | | 1 | - | |
| 1459 | CLAY AND RELATED MINERALS, N.E.C. . | 103 | 209 | 9 | 3 | 2 | 2 | 2 | - | - | |
| 147 | CHEMICAL AND FERTILIZER MINERALS. . . | (0) | (0) | 3 | 1 | - | - | - | - | 1 | 1 |
| 1476 | ROCK SALT . . . . . . . . . . . . | (0) | (0) | 2 | - | - | - | - | - | 1 | 1 |
| -- | ADMINISTRATIVE AND AUXILIARY. . . . . | 2 882 | 8 804 | 31 | 4 | 11 | 5 | 1 | 3 | 5 | - |
| ... | CONTRACT CONSTRUCTION . . . . . . . . | 136 868 | 350 121 | 14 568 | 7 433 | 3 128 | 2 510 | 1 091 | 279 | 102 | 22 |
| 15 | GENERAL BUILDING CONTRACTORS. . . . . | 38 656 | 93 076 | 3 987 | 2 031 | 888 | 672 | 278 | 83 | 26 | 7 |
| 16 | HEAVY CONSTRUCTION CONTRACTORS. . . . | 19 363 | 53 888 | 1 124 | 416 | 247 | 244 | 142 | 43 | 26 | 5 |
| 161 | HIGHWAY AND STREET CONSTRUCTION . . . | 6 270 | 15 163 | 460 | 163 | 114 | 110 | 52 | 11 | 9 | 1 |
| 162 | HEAVY CONSTRUCTION, N.E.C.. . . . . . | 13 080 | 38 714 | 662 | 253 | 132 | 133 | 90 | 32 | 17 | 4 |
| 17 | SPECIAL TRADE CONTRACTORS . . . . . . | 78 253 | 201 187 | 9 431 | 4 983 | 1 990 | 1 587 | 662 | 149 | 50 | 10 |
| 171 | PLUMBING, HEATING, AIR CONDITIONING . | 20 310 | 58 950 | 2 271 | 1 101 | 513 | 441 | 156 | 42 | 15 | 3 |
| 172 | PAINTING, PAPER HANGING, DECORATING . | 4 403 | 8 860 | 986 | 660 | 202 | 83 | 37 | 4 | | |
| 173 | ELECTRICAL WORK . . . . . . . . . . | 12 698 | 42 066 | 1 046 | 463 | 208 | 223 | 113 | 22 | 14 | 3 |
| 174 | MASONRY, STONEWORK, AND PLASTERING. . | 9 962 | 20 888 | 1 327 | 722 | 282 | 217 | 79 | 21 | 6 | - |
| 1741 | MASONRY AND OTHER STONEWORK . . . . | 7 558 | 14 637 | 1 004 | 537 | 221 | 169 | 58 | 15 | 4 | - |
| 1742 | PLASTERING AND LATHING. . . . . . . | 1 578 | 3 938 | 210 | 122 | 46 | 22 | 14 | 4 | 2 | - |
| 1743 | TERRAZZO, TILE, MARBLE, MOSAIC WORK | 826 | 2 314 | 113 | 63 | 15 | 26 | 7 | 2 | - | - |
| 175 | CARPENTERING AND FLOORING . . . . . . | 5 870 | 11 386 | 1 025 | 643 | 204 | 133 | 32 | 8 | 4 | 1 |
| 1751 | CARPENTERING. . . . . . . . . . . | 3 685 | 6 527 | 677 | 418 | 140 | 90 | 22 | 6 | 1 | |
| 1752 | FLOOR LAYING & FLOORWORK, N.E.C.. . | 2 185 | 4 857 | 348 | 225 | 64 | 43 | 10 | 2 | 3 | 1 |
| 176 | ROOFING AND SHEET METAL WORK. . . . . | 5 577 | 13 464 | 645 | 331 | 135 | 112 | 52 | 12 | 2 | 1 |
| 177 | CONCRETE WORK . . . . . . . . . . . | 3 411 | 6 952 | 494 | 269 | 118 | 76 | 27 | 1 | 2 | 1 |
| 178 | WATER WELL DRILLING . . . . . . . . | 405 | 740 | 110 | 85 | 15 | 6 | 4 | - | - | |
| 179 | MISC. SPECIAL TRADE CONTRACTORS . . . | 15 193 | 37 130 | 1 460 | 674 | 300 | 281 | 159 | 38 | 7 | 1 |
| 1791 | STRUCTURAL STEEL ERECTION . . . . . | 2 802 | 8 693 | 105 | 13 | 18 | 35 | 27 | 9 | 2 | 1 |
| 1792 | ORNAMENTAL METAL WORK . . . . . . . | 165 | 468 | 18 | 7 | 6 | 1 | 4 | - | | |
| 1793 | GLASS AND GLAZING WORK. . . . . . . | 382 | 829 | 72 | 33 | 25 | 11 | 3 | - | - | |
| 1794 | EXCAVATING AND FOUNDATION WORK. . . | 3 827 | 7 934 | 550 | 303 | 115 | 90 | 34 | 7 | 1 | - |
| 1795 | WRECKING AND DEMOLITION WORK. . . . | 410 | 902 | 33 | 14 | 5 | 7 | 7 | - | - | |
| 1796 | INSTALLING BLDG. EQUIP., N.E.C.. . . | 468 | 1 631 | 24 | 9 | 2 | 5 | 6 | 2 | - | |
| 1799 | SPECIAL TRADE CONTRACTORS, N.E.C. . | 7 114 | 16 571 | 654 | 294 | 127 | 132 | 77 | 20 | 4 | - |
| -- | ADMINISTRATIVE AND AUXILIARY. . . . . | 596 | 1 970 | 26 | 3 | 3 | 7 | 9 | 4 | | |
| ... | MANUFACTURING . . . . . . . . . . . | 1 327 398 | 3 211 106 | 14 864 | 2 848 | 2 234 | 3 300 | 2 766 | 1 449 | 1 285 | 516 |
| 19 | ORDNANCE AND ACCESSORIES. . . . . . . | 3 001 | 9 686 | 15 | 2 | 1 | 1 | 4 | 2 | 1 | 1 |
| 20 | FOOD AND KINDRED PRODUCTS . . . . . . | 68 927 | 142 544 | 1 189 | 181 | 182 | 258 | 245 | 131 | 133 | 45 |
| 201 | MEAT PRODUCTS . . . . . . . . . . . | 11 831 | 26 537 | 214 | 25 | 41 | 52 | 50 | 24 | 13 | 3 |
| 2011 | MEAT PACKING PLANTS . . . . . . . . | 8 609 | 20 166 | 131 | 13 | 27 | 29 | 32 | 15 | 9 | 3 |
| 2013 | SAUSAGES AND OTHER PREPARED MEATS . | 2 371 | 5 275 | 48 | 6 | 9 | 11 | 11 | 5 | 3 | - |
| 2015 | POULTRY DRESSING PLANTS . . . . . . | 851 | 1 095 | 35 | 6 | 5 | 12 | 7 | 4 | 1 | |
| 202 | DAIRY PRODUCTS. . . . . . . . . . . | 11 850 | 25 380 | 217 | 35 | 22 | 45 | 51 | 30 | 24 | 8 |
| 2021 | CREAMERY BUTTER . . . . . . . . . . | 232 | 360 | 6 | - | 1 | 2 | 1 | 1 | 1 | |
| 2022 | CHEESE, NATURAL AND PROCESSED . . . | 844 | 1 450 | 26 | 11 | 3 | 5 | 4 | 1 | 1 | 1 |
| 2023 | CONDENSED AND EVAPORATED MILK . . . | 916 | 2 082 | 16 | 2 | 1 | 4 | 3 | 2 | 3 | 1 |
| 2024 | ICE CREAM AND FROZEN DESSERTS . . . | 807 | 1 483 | 35 | 6 | 7 | 9 | 10 | 1 | 2 | |
| 2026 | FLUID MILK. . . . . . . . . . . . | 8 991 | 20 005 | 134 | 16 | 10 | 25 | 33 | 25 | 17 | 6 |

APPENDIX TO OPINION AND ORDER
DATED MAY 20, 1999

# 1972
# SURVEY OF
# MINORITY-OWNED
# BUSINESS
# ENTERPRISES

BUREAU OF THE CENSUS
SPECIAL REPORT

# Minority-Owned Businesses

MB72-4

## U. S. DEPARTMENT OF COMMERCE
Rogers C. B. Morton, Secretary
James L. Pate, Associate Secretary for Economic Affairs

Social and Economic Statistics Administration
Edward D. Failor, Administrator

BUREAU OF THE CENSUS
Vincent P. Barabba, Director

Issued May 1975

TABLE 2. Selected Statistics by Geographic Division, State, and

| Line number | Geographic division, State, and industry | All firms | | With paid employees | | | | | Without paid employees | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Firms | Gross receipts | Firms | Employees | Gross receipts | Average employees per firm | Average receipts per firm | Firms | Gross receipts | Average receipts per firm |
| | | (number) | ($1,000) | (number) | (number) | ($1,000) | (number) | ($1,000) | (number) | ($1,000) | ($1,000) |
| 1 | Middle Atlantic | 44,309 | 1,735,232 | 7,658 | 38,254 | 1,198,921 | 5 | 157 | 36,651 | 536,311 | 15 |
| 2 | New York | 23,844 | 882,578 | 3,798 | 20,259 | 619,822 | 5 | 163 | 20,046 | 262,756 | 13 |
| 3 | Construction | 1,468 | 80,434 | 227 | 1,819 | 45,211 | 9 | 199 | 1,241 | 15,223 | 12 |
| 4 | Manufacturing | 615 | 69,964 | 280 | 3,629 | 65,387 | 13 | 235 | 335 | 3,977 | 12 |
| 5 | Transportation and public utilities | 1,812 | 38,386 | 165 | 836 | 20,196 | 5 | 122 | 1,647 | 18,190 | 11 |
| 6 | Wholesale trade | 584 | 127,890 | 194 | 890 | 116,587 | 5 | 601 | 390 | 11,303 | 29 |
| 7 | Retail trade | 6,513 | 334,134 | 1,515 | 5,381 | 215,184 | 4 | 142 | 4,998 | 118,950 | 24 |
| 8 | Finance, insurance, and real estate | 1,179 | 35,246 | 188 | 1,604 | 46,364 | 3 | 247 | 991 | 8,882 | 9 |
| 9 | Selected services | 10,163 | 179,106 | 1,196 | 5,412 | 106,100 | 5 | 99 | 8,967 | 73,006 | 8 |
| 10 | Other industries | 205 | 3,422 | 15 | 123 | 1,112 | 8 | 74 | 190 | 2,310 | 12 |
| 11 | Industries not classified | 1,305 | 14,096 | 18 | 63 | 3,181 | 4 | 177 | 1,287 | 10,915 | 8 |
| 12 | New Jersey | 8,762 | 365,706 | 1,523 | 7,883 | 253,436 | 5 | 166 | 7,239 | 112,270 | 16 |
| 13 | Construction | 784 | 36,576 | 166 | 952 | 25,497 | 6 | 154 | 618 | 11,079 | 18 |
| 14 | Manufacturing | 166 | 25,640 | 87 | 995 | 24,505 | 11 | 282 | 79 | 1,135 | 14 |
| 15 | Transportation and public utilities | 1,134 | 35,213 | 123 | 602 | 19,775 | 5 | 161 | 1,011 | 15,438 | 15 |
| 16 | Wholesale trade | 166 | 47,208 | 56 | 368 | 43,906 | 7 | 784 | 110 | 3,302 | 30 |
| 17 | Retail trade | 2,465 | 149,258 | 552 | 2,379 | 98,859 | 4 | 179 | 1,913 | 50,399 | 26 |
| 18 | Finance, insurance, and real estate | 303 | 17,105 | 45 | 473 | 14,434 | 11 | 321 | 258 | 2,651 | 10 |
| 19 | Selected services | 3,042 | 47,153 | 479 | 1,878 | 25,768 | 4 | 54 | 2,563 | 21,385 | 8 |
| 20 | Other industries | 134 | 1,807 | 10 | 29 | 566 | 3 | 57 | 124 | 1,241 | 10 |
| 21 | Industries not classified | 568 | 5,746 | 5 | 7 | 106 | 1 | 21 | 563 | 5,640 | 10 |
| 22 | Pennsylvania | 8,903 | 408,948 | 1,637 | 9,312 | 279,763 | 6 | 171 | 7,266 | 129,185 | 18 |
| 23 | Construction | 732 | 40,652 | 143 | 792 | 24,507 | 6 | 171 | 609 | 16,145 | 27 |
| 24 | Manufacturing | 166 | 23,823 | 79 | 1,096 | 22,158 | 14 | 280 | 87 | 1,663 | 19 |
| 25 | Transportation and public utilities | 639 | 18,582 | 89 | 589 | 9,898 | 7 | 111 | 550 | 8,684 | 16 |
| 26 | Wholesale trade | 129 | 38,554 | 63 | 364 | 34,646 | 6 | 550 | 68 | 3,908 | 59 |
| 27 | Retail trade | 2,750 | 201,765 | 686 | 3,492 | 136,244 | 5 | 199 | 2,064 | 65,521 | 32 |
| 28 | Finance, insurance, and real estate | 300 | 21,238 | 69 | 486 | 18,513 | 7 | 268 | 231 | 2,725 | 12 |
| 29 | Selected services | 3,768 | 59,872 | 494 | 2,440 | 32,539 | 5 | 66 | 3,274 | 27,133 | 8 |
| 30 | Other industries | 77 | 1,309 | 6 | 19 | 469 | 3 | 78 | 71 | 840 | 12 |
| 31 | Industries not classified | 322 | 3,353 | 8 | 34 | 789 | 4 | 99 | 314 | 2,564 | 8 |
| 32 | Not allocated by State | 2,800 | 78,000 | 700 | 1,000 | 45,900 | 1 | 66 | 2,100 | 32,100 | 15 |
| 33 | East North Central | 47,304 | 2,066,662 | 9,661 | 55,454 | 1,539,113 | 6 | 159 | 37,643 | 527,549 | 14 |
| 34 | Ohio | 11,877 | 394,574 | 1,984 | 10,792 | 276,402 | 5 | 139 | 9,893 | 118,172 | 12 |
| 35 | Construction | 1,188 | 48,002 | 212 | 1,301 | 34,296 | 6 | 162 | 976 | 13,706 | 14 |
| 36 | Manufacturing | 151 | 23,519 | 52 | 834 | 22,433 | 16 | 431 | 99 | 1,086 | 11 |
| 37 | Transportation and public utilities | 1,341 | 30,537 | 119 | 461 | 15,358 | 4 | 129 | 1,222 | 15,179 | 12 |
| 38 | Wholesale trade | 107 | 23,897 | 44 | 286 | 22,595 | 7 | 514 | 63 | 1,302 | 21 |
| 39 | Retail trade | 5,383 | 184,621 | 892 | 4,385 | 132,310 | 5 | 148 | 2,471 | 52,311 | 21 |
| 40 | Finance, insurance, and real estate | 709 | 14,669 | 67 | (D) | (D) | (D) | (D) | 642 | (D) | (D) |
| 41 | Selected services | 4,396 | 82,607 | 573 | 3,124 | 38,541 | 5 | 67 | 3,823 | 24,066 | 6 |
| 42 | Other industries | 148 | 2,270 | 10 | 32 | 940 | 3 | 94 | 138 | 1,330 | 10 |
| 43 | Industries not classified | 472 | 4,252 | 15 | (D) | (D) | (D) | (D) | 457 | (D) | (D) |
| 44 | Indiana | 3,831 | 151,496 | 775 | 4,696 | 112,387 | 6 | 145 | 3,056 | 39,108 | 13 |
| 45 | Construction | 393 | 16,840 | 96 | 649 | 12,519 | 7 | 130 | 297 | 4,321 | 15 |
| 46 | Manufacturing | 50 | 4,558 | 20 | 215 | 4,265 | 11 | 213 | 30 | 293 | 10 |
| 47 | Transportation and public utilities | 396 | 10,190 | 29 | (D) | (D) | (D) | (D) | 369 | (D) | (D) |
| 48 | Wholesale trade | 51 | 21,380 | 26 | (D) | (D) | (D) | (D) | 25 | (D) | (D) |
| 49 | Retail trade | 1,176 | 67,119 | 361 | 1,813 | 49,349 | 5 | 137 | 815 | 17,770 | 22 |
| 50 | Finance, insurance, and real estate | 152 | 3,151 | 22 | 103 | 1,849 | 5 | 84 | 130 | 1,302 | 10 |
| 51 | Selected services | 1,369 | 25,548 | 211 | 1,445 | 17,681 | 7 | 84 | 1,158 | 7,867 | 7 |
| 52 | Other industries | 44 | 1,187 | 6 | 31 | 455 | 5 | 76 | 38 | 732 | 19 |
| 53 | Industries not classified | 198 | 1,522 | 4 | (D) | (D) | (D) | (D) | 194 | (D) | (D) |
| 54 | Illinois | 15,475 | 788,948 | 3,060 | 19,929 | 600,842 | 7 | 196 | 12,415 | 188,106 | 15 |
| 55 | Construction | 845 | 50,897 | 177 | 1,446 | 39,876 | 8 | 225 | 668 | 11,021 | 16 |
| 56 | Manufacturing | 308 | 84,226 | 126 | 2,110 | 81,138 | 17 | 644 | 182 | 3,068 | 17 |
| 57 | Transportation and public utilities | 906 | 30,150 | 102 | 800 | 18,499 | 8 | 181 | 804 | 11,651 | 14 |
| 58 | Wholesale trade | 300 | 78,693 | 108 | 611 | 72,986 | 6 | 676 | 192 | 5,707 | 30 |
| 59 | Retail trade | 3,829 | 370,306 | 1,515 | 7,826 | 268,920 | 5 | 178 | 4,314 | 101,386 | 24 |
| 60 | Finance, insurance, and real estate | 816 | 48,561 | 163 | 1,863 | 41,603 | 11 | 255 | 653 | 6,958 | 11 |
| 61 | Selected services | 5,545 | 118,156 | 840 | 5,153 | 78,415 | 6 | 91 | 4,708 | 39,741 | 8 |
| 62 | Other industries | 131 | 2,734 | 7 | 84 | 733 | 9 | 105 | 124 | 2,001 | 16 |
| 63 | Industries not classified | 792 | 7,225 | 22 | 56 | 672 | 3 | 31 | 770 | 6,553 | 9 |
| 64 | Michigan | 9,483 | 481,772 | 2,070 | 12,772 | 365,130 | 6 | 178 | 7,413 | 112,652 | 15 |
| 65 | Construction | 713 | 37,648 | 135 | 948 | 27,911 | 7 | 207 | 580 | 9,737 | 17 |
| 66 | Manufacturing | 152 | 35,071 | 73 | 960 | 33,839 | 13 | 464 | 79 | 1,232 | 16 |
| 67 | Transportation and public utilities | 788 | 18,871 | 88 | 660 | 9,754 | 8 | 111 | 700 | 9,117 | 13 |
| 68 | Wholesale trade | 121 | 57,954 | 49 | 605 | 55,820 | 12 | 1,139 | 72 | 2,134 | 30 |
| 69 | Retail trade | 3,187 | 242,020 | 1,040 | 5,353 | 183,672 | 5 | 177 | 2,147 | 58,348 | 27 |
| 70 | Finance, insurance, and real estate | 559 | 18,135 | 75 | 598 | 13,089 | 8 | 175 | 484 | 5,046 | 10 |
| 71 | Selected services | 3,437 | 65,495 | 588 | 3,394 | 43,095 | 6 | 73 | 2,849 | 22,400 | 6 |
| 72 | Other industries | 146 | 2,661 | 12 | 28 | 1,350 | 2 | 113 | 134 | 1,311 | 10 |
| 73 | Industries not classified | 378 | 3,917 | 10 | 16 | 590 | 3 | 59 | 368 | 3,327 | 9 |

D Withheld to avoid disclosing figures for individual companies.

[1]Not calculated for national sample.